# Exhibit B

# TABLE OF CONTENTS

**Page**

## LEASE AGREEMENT

between

## JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)

and

## HUAWEI DEVICE USA INC.,
a Texas corporation

1.  LEASED PREMISES ........................................................................................ 1

2.  TERM ............................................................................................................... 1
    (a) Term ........................................................................................................ 1
    (b) Intentionally Omitted ............................................................................. 1
    (c) Over-holding ........................................................................................... 1

3.  RENT ............................................................................................................... 2
    (a) Basic Rent ............................................................................................... 2
    (b) Additional Rent ...................................................................................... 2
    (c) Payment - Additional Rent ..................................................................... 3
    (d) Recovery of Rent .................................................................................... 3
    (e) Accrual of Rent ....................................................................................... 3
    (f) Limitations .............................................................................................. 3

4.  INTENTIONALLY OMITTED ....................................................................... 4

5.  GENERAL COVENANTS ............................................................................... 4
    (a) Landlord's Covenants .............................................................................. 4
    (b) Tenant's Covenants ................................................................................. 4

6.  USE AND OCCUPANCY ................................................................................ 4
    (a) Use 4
    (b) Waste; Nuisance ...................................................................................... 4
    (c) Insurance Risks ....................................................................................... 4
    (d) Compliance with Law ............................................................................. 4
    (e) Environmental Compliance ..................................................................... 5
    (f) Rules and Regulations ............................................................................. 5

7.  ASSIGNMENT AND SUBLETTING .............................................................. 5
    (a) No Assignment and Subletting ................................................................ 5
    (b) Assignment or Subletting Procedures ..................................................... 5
    (c) Excess Transfer Rent ............................................................................... 6
    (d) Assumption of Obligations ..................................................................... 6
    (e) Tenant's Continuing Obligations ............................................................ 6
    (f) Change of Control .................................................................................... 6
    (g) No Transfers to Existing Tenants ............................................................ 7
    (h) Affiliated Transfers ................................................................................. 7

8.  REPAIR & DAMAGE ..................................................................................... 7
    (a) Landlord's Repairs to Building and Property .......................................... 7
    (b) Landlord's Repairs to the Leased Premises ............................................ 8
    (c) Tenant's Repairs ...................................................................................... 8
    (d) Indemnification ....................................................................................... 8
    (e) Damage and Destruction ......................................................................... 8

9.  INSURANCE AND LIABILITY ..................................................................... 9

**Page**

(a) Landlord's Insurance ........................................................................................ 9
(b) Tenant's Insurance .......................................................................................... 10
(c) Limitation of Landlord's Liability .................................................................. 10
(d) Indemnity of Landlord ................................................................................... 10
(e) Definition of Insured Damage ....................................................................... 11
(f) Waiver of Subrogation .................................................................................... 11
(g) Indemnity of Tenant ....................................................................................... 11

10.   EVENTS OF DEFAULT AND REMEDIES ......................................................... 11
      (a) Events of Default and Remedies .................................................................. 11
      (b) Attorneys' Fees ............................................................................................ 13

11.   COMMON AREAS ................................................................................................ 13

12.   RELOCATION OF LEASED PREMISES ............................................................. 13

13.   SUBORDINATION AND ATTORNMENT ........................................................... 14

14.   ESTOPPEL CERTIFICATES ................................................................................. 14

15.   INSPECTION OF AND ACCESS TO LEASED PREMISES ................................ 14

16.   DELAY .................................................................................................................... 15

17.   WAIVER .................................................................................................................. 15

18.   SALE, DEMOLITION AND RENOVATION ........................................................ 15

19.   PUBLIC TAKING ................................................................................................... 15

20.   REGISTRATION OF LEASE ................................................................................. 16

21.   LEASE ENTIRE AGREEMENT ............................................................................ 16

22.   NOTICES ................................................................................................................. 16

23.   INTERPRETATION ................................................................................................ 17

24.   EXTENT OF LEASE OBLIGATIONS ................................................................... 17

25.   LIMITATION ON LANDLORD LIABILITY ........................................................ 17

26.   WAIVER OF JURY TRIAL .................................................................................... 17

27.   CHOICE OF LAW .................................................................................................. 17

28.   TERRORISM, MONEY LAUNDERING, CORRUPT PRACTICES DISCLOSURE ......................... 17

29.   TRANSPORTATION, ENVIRONMENTAL SUSTAINABILITY AND ENERGY
      SAVINGS ................................................................................................................ 18

30.   BUILDING TOP SIGNAGE ................................................................................... 18

31.   EXISTING LEASE .................................................................................................. 19

32.   RESTRICTION ON SALE AND LEASING ........................................................... 19

33.   SCHEDULES ........................................................................................................... 20

INITIAL
Landlord  |  Tenant

THIS LEASE AGREEMENT ("Lease") is made this 17th day of November, 2016 (the "Effective Date" or "Date of Lease")

BETWEEN:

**JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.),**
a Michigan corporation

      (hereinafter called "Landlord")

--- and ---

**HUAWEI DEVICE USA INC.,**
a Texas corporation

      (hereinafter called "Tenant")

      In consideration of the rents, covenants and agreements hereinafter contained, Landlord and Tenant hereby agree as follows:

## 1.    LEASED PREMISES

      Landlord does demise and lease to Tenant the premises (the "Leased Premises" or "Premises") located in a building (the "Building") having a municipal address of 10180 Telesis Court, San Diego, California 92121, which Building is part of a multi-building office project known as "Seaview Corporate Center" containing four (4) other buildings whose addresses are 10182, 10184, 10188, and 10190 Telesis Court (collectively, the "Related Buildings").  The Building, the Related Buildings, the outside plaza areas, landscaped areas, parking facilities, walkways and other improvements and facilities now or hereafter surrounding the Building and Related Buildings and included by Landlord from time to time as part of Seaview Corporate Center, and the land upon which all of the foregoing are situated being herein referred to collectively as the "Property".  The Leased Premises are located on a portion of the first (1st) floor of the Building, known as Suite 165; a portion of the third (3rd) floor of the Building, known as Suites 300 and 350; and, the entire fourth (4th) floor of the Building, known as Suite 400 and the approximate location of which is outlined in heavy black or cross-hatched on the plan attached hereto as Schedule "A".  The parties agree that the Rentable Area of the Leased Premises is a total of 29,767 square feet, consisting of Suite 165 (6,830 RSF), Suite 300 (1,965 RSF), Suite 350 (1,829 RSF) and Suite 400 (19,143 RSF) and has been measured in accordance with the provisions of Schedule "B" attached hereto, and is not subject to adjustment or re-measurement by Landlord or Tenant.  Accordingly, there shall be no adjustment in the Basic Rent or other amounts set forth in this Lease which are determined based upon Rentable Area of the Leased Premises.

## 2.    TERM

(a) Term

      (a)    TO HAVE AND TO HOLD the Leased Premises for and during the term of seven (7) years and ten (10) months (the "Term") commencing upon the Commencement Date (as defined below), and to be fully complete and ended on the date which is seven (7) years and ten (10) months after the Commencement Date (the "Expiration Date"), unless sooner terminated.  For purposes hereof, the "Commencement Date" is May 1, 2017 and the "Expiration Date" is February 28, 2025.

(b) Intentionally Omitted

(c) Over-holding

      (c)    If at the expiration of the Term or sooner termination of this Lease, Tenant shall remain in possession of the Leased Premises without any further written agreement or in circumstances where a tenancy would thereby be created by implication of law or otherwise, a tenancy from year to year shall not be created by implication of law or otherwise, but Tenant shall be deemed to be a monthly tenant at 1.5 times the then-current Basic Rent (as hereinafter defined) payable monthly in advance plus Additional Rent (as hereinafter defined) and otherwise upon and subject to the same terms and conditions as herein contained, excepting provisions for renewal (if any) and leasehold improvement allowance (if any), contained herein, and nothing, including the acceptance of any Rent by Landlord, for periods other than monthly periods, shall extend this Lease to the contrary except an agreement in writing between Landlord and Tenant, and Tenant hereby authorizes Landlord to apply any moneys received from Tenant in payment of such monthly Rent.  Notwithstanding the foregoing, if Tenant shall hold over after the

INITIAL   Landlord  |  Tenant

expiration of the Term and Landlord shall desire to regain possession of the Leased Premises promptly at the expiration of the Term, then:  (i) Landlord, at its sole option, may forthwith re-enter and take possession of the Leased Premises by any legal process in accordance with Applicable Laws (as hereafter defined), Tenant hereby expressly waiving any and all notices to cure or vacate or to quit the Leased Premises provided by current or future Applicable Laws (except for those notices specifically outlined in this Lease); and (ii) in addition to any other liabilities to Landlord accruing from Tenant's holding over, Tenant shall protect, defend, indemnify and hold Landlord harmless from and against all losses, costs (including, without limitation, attorneys' fees and court costs and disbursements, if any), expenses, claims and damages suffered by Landlord resulting from such holdover, including, without limitation, any lost rental and profits resulting therefrom.

### 3.    RENT

(a) Basic Rent

(a)    Tenant shall, without notice, demand, deduction or right of offset, pay to Landlord during the Term as basic or fixed rental (herein called "Basic Rent"), the following sums:

| Months of Term | Annual Basic Rent Rate Per Square Foot of Rentable Area of Leased Premises | Annual Basic Rent | Monthly Basic Rent |
|---|---|---|---|
| 1-12 | $33.60 | $1,000,171.20 | $83,347.60 |
| 13-24 | $34.61 | $1,030,235.87 | $85,852.99 |
| 25-36 | $35.65 | $1,061,193.55 | $88,432.80 |
| 37-48 | $36.72 | $1,093,044.24 | $91,087.02 |
| 49-60 | $37.82 | $1,125,787.94 | $93,815.66 |
| 61-72 | $38.95 | $1,159,424.65 | $96,618.72 |
| 73-84 | $40.12 | $1,194,252.04 | $99,521.00 |
| 85-94 | $41.32 | $1,229,972.44 | $102,497.70 |

Each monthly Basic Rent payment will be paid by Tenant to Landlord in advance on or before the first day of each month during the Term.

Notwithstanding the foregoing provisions of this Paragraph 3(a) to the contrary, and provided that Tenant is not in default of any of its obligations under this Lease after expiration of any applicable notice and cure periods, Landlord hereby agrees to abate Tenant's obligation to pay the monthly Basic Rent and Additional Rent (the "Abated Rent") otherwise payable by Tenant for months two (2) through (11) of the Term of this Lease (the "Abatement Period").  During the Abatement Period, Tenant shall remain responsible for the payment of all of its other monetary obligations under this Lease.  Notwithstanding the foregoing to the contrary, upon notice to Tenant given at any time prior to the expiration of the Abatement Period, Landlord shall have the right to purchase the then-unapplied Abated Rent (or such portion thereof as designated by Landlord for purchase in such notice) by paying to Tenant an amount equal to such then-unapplied Abated Rent (or portion thereof so designated by Landlord in such notice), in which case such then-unapplied Abated Rent (or portion thereof) so purchased by Landlord shall no longer be abated as scheduled herein (any such then-unapplied Abated Rent or portion thereof so purchased by Landlord shall be referred to herein as the "Purchased Abated Rent").  In the event of an uncured default by Tenant under the terms of this Lease that results in the early termination of this Lease pursuant to the provisions of Paragraph 10 below, then as a part of the recovery set forth in Paragraph 10 below, Landlord shall be entitled to the recovery of the Abated Rent and Purchased Abated Rent previously abated and paid by Landlord, as the case may be.

(b) Additional Rent

(b)    Tenant shall, without deduction or right of offset, except as otherwise expressly provided in this Lease, pay to Landlord during the Term as additional rental (herein called "Additional Rent")

(i)    the amounts of any Landlord's Taxes payable by Tenant to Landlord pursuant to the provisions of Schedule "C" attached hereto; and



INITIAL    Landlord    |    Tenant

(ii)   the amounts of any Operating Costs payable by Tenant to Landlord pursuant to the provisions of Schedule "D" attached hereto.

(c) Payment -
Additional Rent

(c)    Additional Rent shall be paid and adjusted with reference to a fiscal period of twelve (12) calendar months ("Fiscal Period"), which shall be a calendar year unless Landlord shall from time to time have selected a Fiscal Period which is not a calendar year by written notice to Tenant.

Landlord shall advise Tenant in writing of its estimate (the "Estimate") of the Additional Rent to be payable by Tenant during the Fiscal Period (or partial portion of the Fiscal Period, as the case may be, if applicable, at the commencement or at the end of the Term or because of a change in Fiscal Period) which commenced upon the Commencement Date of the Term and for each succeeding Fiscal Period or partial portion thereof which commences during the Term.   Such Estimate shall in every case be a reasonable estimate and, if requested by Tenant, shall be accompanied by reasonable particulars of the manner in which it was calculated.   The Additional Rent payable by Tenant shall be paid in equal monthly installments in advance at the same time as payment of Basic Rent is due hereunder based on Landlord's Estimate as aforesaid.   From time to time, Landlord may re-estimate, on a reasonable basis, the amount of Additional Rent for any Fiscal Period or partial portion thereof, in which case Landlord shall advise Tenant in writing of such re-estimate and fix new equal monthly installments for the remaining balance of such Fiscal Period or partial portion thereof.   After the end of each such Fiscal Period or partial portion thereof Landlord shall provide Tenant with a statement (the "Actual Statement") of the actual Additional Rent payable in respect of such Fiscal Period or partial portion thereof and a calculation of the amounts by which the Additional Rent payable by Tenant exceeds or is less than (as the case may be) the aggregate installments paid by Tenant on account of Additional Rent for such Fiscal Period.

Within thirty (30) days after the submission of such Actual Statement either Tenant shall pay to Landlord any amount by which the amount found payable by Tenant with respect to such Fiscal Period or partial portion thereof exceeds the aggregate of the monthly payments made by it on account thereof during such Fiscal Period or partial portion thereof, or Landlord shall pay to Tenant any amount by which the amount found payable as aforesaid is less than the aggregate of such monthly payments.

(d) Recovery
of Rent

(d)    In this Lease "Rent" means all amounts required to be paid by Tenant pursuant to this Lease including without limitation Basic Rent, Additional Rent and all other amounts payable by Tenant pursuant to Schedules "C" and "D" attached hereto.

(e) Accrual
of Rent

(e)    Basic Rent and Additional Rent shall be considered as accruing from day to day, and for an irregular period of less than one year or less than one calendar month shall be apportioned and adjusted by Landlord for the Fiscal Periods of Landlord in which the tenancy created hereby commences and expires. Where the calculation of Additional Rent and/or any other amounts payable by Tenant pursuant to Schedules "C" and "D" attached hereto for a period cannot be made until after the termination of this Lease, the obligation of either party to pay or reimburse Additional Rent and/or such other amounts shall survive the termination hereof and Additional Rent and/or such other amounts for such period shall be payable by the other party within thirty (30) days after receipt of the Actual Statement by Landlord.   If the Term commences on any day other than the first day of a calendar month, Basic Rent and Additional Rent for such fraction of a calendar month shall be apportioned and adjusted as aforesaid and paid by Tenant on the Commencement Date of the Term.

(f) Limitations

(f)    The information set out in each Actual Statement submitted to Tenant pursuant to this Lease shall be binding on Tenant and deemed to be accepted by it and shall not be subject to amendment for any reason unless Tenant gives written notice (the "Dispute Notice") to Landlord within sixty (60) days after Landlord's submission of such Actual Statement, identifying such Actual Statement, and setting forth, in reasonable detail, the reason why the Actual Statement is in error or otherwise should not be binding on Tenant.   If Tenant timely disputes the amount of the Additional Rent as set forth in such Actual Statement as aforesaid, and if such dispute is not resolved within thirty (30) days after Tenant delivers the Dispute Notice to Landlord, then Landlord shall cause an audited statement of Additional Rent to be prepared by an independent nationally or regionally recognized firm of certified public accountants selected by Landlord but that has no ongoing business relationship with Landlord.   The statement of Additional Rent as prepared by such accountants shall be final and binding upon the parties hereto and within fifteen (15) days after delivery of such statement of Additional Rent to the parties by the accountants Landlord and Tenant shall readjust Additional Rent as contemplated by Paragraph 3(c) above.   The cost of preparation

INITIAL
Landlord    |    Tenant

of such audited statement shall be paid by Tenant as Rent unless the amount of Additional Rent payable by Tenant as set forth in such audited financial statement is at least 5% less than the amount of Additional Rent demanded by Landlord in accordance with the Actual Statement delivered to Tenant pursuant to Paragraph 3(c) above.

### 4.    INTENTIONALLY OMITTED

### 5.    GENERAL COVENANTS

(a) Landlord's
Covenants

(a)    Landlord covenants with Tenant:

(i)    subject to Landlord's rights resulting from Tenant's failure to perform any of its obligations under this Lease, Tenant shall have the right of quiet enjoyment of the Leased Premises in accordance with this Lease;

(ii)    to observe and perform all the covenants and obligations of Landlord herein; and

(iii)    that Tenant and its employees shall be permitted to access the Leased Premises 24 hours per day, 7 days per week, subject to (A) such rules and regulations regarding such access as described in Paragraph 6(f) below, and (B) the other provisions of this Lease.

(b) Tenant's
Covenants

(b)    Tenant covenants with Landlord:

(i)    to pay Rent; and

(ii)    to observe and perform all the covenants and obligations of Tenant herein.

### 6.    USE AND OCCUPANCY

Tenant covenants with Landlord:

(a) Use

(a)    not to use the Leased Premises for any purpose other than an office for the conduct of Tenant's business, which is general office use and light research and development (including an electronics test lab) and, on an ancillary basis, for other legal related uses, all as shall be consistent with the character of the Property and compatible with the other uses of the Property;

(b) Waste;
Nuisance.

(b)    not to commit, or permit, any waste, injury or damage to the Property including the Leasehold Improvements (as defined in Schedule "F") and any trade fixtures, furniture, equipment and personal property therein, any loading of the floors thereof in excess of the maximum degree of loading as determined by Landlord acting reasonably, any nuisance therein or any use or manner of use causing annoyance to other tenants and occupants of the Property or to Landlord;

(c) Insurance
Risks

(c)    not to do, omit or permit to be done or omitted to be done upon the Property anything which would cause to be increased Landlord's cost of insurance or the costs of insurance of another tenant of the Property against perils as to which Landlord or such other tenant has insured or which shall cause any policy of insurance on the Property to be subject to cancellation;

(d) Compliance
with Law

(d)    to comply at its own expense with all common law and all applicable federal, state, local, municipal, governmental or quasi-governmental laws, by-laws, rules, regulations, licenses, orders, guidelines, directives, permits, decisions or requirements (collectively, "Applicable Laws") pertaining to the occupation and use of the Leased Premises, the condition of the Leasehold Improvements, trade fixtures, furniture, equipment and personal property installed therein, and the making by Tenant of any repairs, changes or improvements therein or thereto; provided, however, that Tenant shall not be required to make any capital improvements to the Leased Premises in order to comply with Applicable Laws,

unless required as a result of Tenant's specific use of the Leased Premises or any Leasehold Improvements;

**(e) Environmental Compliance**

      (e)    (i)    to conduct and maintain its business and operations at the Leased Premises so as to comply in all respects with all Applicable Laws concerning occupational or public health and safety or the environment and any order, injunction, judgment, declaration, notice or demand issued thereunder (collectively, "Environmental Laws");

              (ii)    except for Tenant's use of normal and ordinary office supplies and materials in normal and ordinary quantities (e.g., solvent, liquid paper, copier toner, etc.), and used, stored and disposed of in compliance with all Environmental Laws, not to permit or suffer any substance which is hazardous or is prohibited, restricted, regulated or controlled under any Environmental Laws to be present at, on or in the Leased Premises, unless it has received the prior written consent of Landlord which consent may be arbitrarily withheld; and

**(f) Rules and Regulations**

      (f)    to observe and perform, and to cause its employees, agents, licensees, invitees and others over whom Tenant can reasonably be expected to exercise control to observe and perform, the Rules and Regulations contained in Schedule "E" attached hereto, and such further and other reasonable rules and regulations and amendments and additions therein as may hereafter be made by Landlord and notified in writing to Tenant, except that no change or addition may be made that is inconsistent with this Lease unless as may be required by Applicable Laws or unless Tenant consents thereto. The imposition of such Rules and Regulations shall not create or imply any obligation of Landlord to enforce them or create any liability of Landlord for their non-enforcement or otherwise.

## 7.    ASSIGNMENT AND SUBLETTING

**(a) No Assignment and Subletting**

      (a)    Tenant covenants that it will not assign this Lease or sublet all or any part of the Leased Premises or mortgage or encumber this Lease or the Leased Premises or any part thereof, or suffer or permit the occupation of all or any part thereof by others (each of which is a "Transfer") without the prior written consent of Landlord, which consent Landlord covenants not to withhold, condition or delay unreasonably (i) as to any assignee, subtenant or occupant (the "Transferee") who (A) in the case of an assignment, is in a satisfactory financial condition and has sufficient financial wherewithal, in Landlord's reasonable judgment, to satisfy and perform all of the terms and obligations imposed upon the Transferee under the Transfer, (B) agrees to use the Leased Premises for those purposes permitted hereunder, and (C) is otherwise satisfactory to Landlord, and (ii) as to any sublease of a portion of the Leased Premises which, in Landlord's sole judgment, is a proper and rational division of the Leased Premises, subject to Landlord's right of termination pursuant to Paragraph 7(b) below. This prohibition against a Transfer shall be construed to include a prohibition against any Transfer by operation of law.

**(b) Assignment or Subletting Procedures**

      (b)    Tenant shall not effect a Transfer unless:

              (i)    it shall have received or procured a bona fide written offer to take an assignment or sublease which is not inconsistent with this Lease, and the acceptance of which would not breach any provision of this Lease if this paragraph is complied with and which Tenant has determined to accept subject to this paragraph being complied with, and

              (ii)    it shall have first requested and obtained the consent in writing of Landlord thereto.

Any request for consent shall be in writing and accompanied by a copy of the offer certified by Tenant to be true and complete, and Tenant shall furnish to Landlord all information available to Tenant and reasonably requested by Landlord as to the responsibility, financial standing and business of the proposed Transferee. Notwithstanding the provisions of Paragraph 7(a) above to the contrary, prior to subletting the Premises or assigning this Lease, Tenant shall have the right to notify Landlord in writing of its intent to assign this Lease or sublet such portion of the Premises and the time period associated with such subletting. In the event Landlord does not notify Tenant in writing within twenty (20) days following receipt of Tenant's written notice that Landlord intends to recapture the Premises subject to the assignment or subletting, Tenant may proceed to request Landlord's consent to the assignment of this



INITIAL

Landlord  |  Tenant

Lease or sublet of the Premises without the Landlord having any right of recapture, provided such request for Landlord's consent is submitted within one hundred eighty (180) days of Landlord's election (or deemed election) not to recapture, subject to Landlord's other consent rights hereunder.  If Landlord elects to recapture, such recapture shall occur as of a termination date to be stipulated in the notice of termination which shall be not less than sixty (60) days or more than ninety (90) days following the giving of such notice.  In such event, Tenant shall surrender the whole or part, as the case may be, of the Leased Premises in accordance with such notice of termination and Basic Rent and Additional Rent shall be apportioned and paid to the date of surrender and, if a part only of the Leased Premises is surrendered, Basic Rent and Additional Rent shall after the date of surrender abate proportionately.  If Landlord does not recapture, Landlord shall grant, withhold or condition its consent to a subletting or assignment such consent not to be unreasonably withheld, conditioned or delayed and shall be granted, withheld or conditioned no later than thirty (30) days following Landlord's receipt of Tenant's written request for consent and all information reasonably requested by Landlord with respect to such subletting or assignment.  If such consent shall be given, Tenant shall effect the Transfer only upon the terms set out in the offer submitted to Landlord as aforesaid and not otherwise.  Any consent shall be given without prejudice to Landlord's rights under this Lease and shall be limited to the particular Transfer in respect of which it was given and shall not be deemed to be an authorization for or consent to any further or other Transfer.

(c) Excess Transfer
Rent

(c)    If Landlord consents to any Transfer, Tenant shall pay to Landlord, as and when amounts on account are due or paid by the Transferee to Tenant, all excess Transfer rents (hereinafter called the "Excess Transfer Rent"), if any, as Rent.  The Excess Transfer Rent shall be determined by Landlord following Landlord's receipt of all relevant information below in accordance with the following formula:

all gross revenue received by Tenant from the Transferee and attributable to the Transfer less:

(i)    the Rent paid by Tenant to Landlord during the term of the Transfer; and

(ii)   any reasonable and customary out of pocket transaction costs incurred by Tenant in connection with such Transfer including attorneys' fees, brokerage commissions, and alteration costs (which transaction costs shall be amortized on a straight line basis over the term of the Transfer).

Tenant agrees to promptly furnish such information with regard to the Excess Transfer Rent as Landlord may request from time to time.

(d) Assumption of
Obligations

(d)    No Transfer shall be effective unless the Transferee shall execute an agreement on Landlord's form, assuming all the obligations of Tenant hereunder, and shall have paid to Landlord its reasonable fee (which under no circumstances shall exceed $1,000.00), plus the reimbursement of Landlord's reasonable attorneys' fees and costs in connection with same, which shall not exceed $1,000.00 per request for consent, for processing the Transfer.

(e) Tenant's Continuing
Obligations

(e)    Tenant agrees that Landlord's consent to any Transfer hereunder shall not thereby release Tenant from its primary liability for any of Tenant's obligations under this Lease.

(f) Change of
Control

(f)    Subject to and except as provided in Paragraph 7(h) below, if Tenant at any time is a corporation, limited liability company, partnership or other entity, it is acknowledged and agreed that the transfer or issuance of the majority of the stock, membership interests, partnership interests or other ownership interests of such applicable entity or the transfer or issuance of any such ownership interests in such applicable entity sufficient to transfer effective voting control of such applicable entity to others than the shareholders, members, partners or other owners having effective voting control of such applicable entity immediately prior to such transfer or issuance (including, without limitation, in connection with and/or as a result of any dissolution, merger, consolidation or other reorganization of such entity), shall be deemed for all purposes of this Paragraph 7 to be a Transfer and, accordingly, a violation of this Paragraph 7 respecting assignment of this Lease unless the prior written consent of Landlord is first obtained, and Landlord shall have all of the same rights in respect thereof as though any such transfer or issuance or proposed transfer or issuance were a Transfer.  In the event of a Transfer under this Paragraph 7(f), Landlord shall have access to the organizational/entity books and records of Tenant relating to the Transfer, and Tenant shall make the same available to Landlord or its representatives upon request, for

INITIAL
Landlord    |    Tenant

inspection and copying at all times in order to confirm such Transfer. This Paragraph 7(f) shall not apply to Tenant if and for so long as Tenant is a corporation whose shares are listed and traded on any recognized stock exchange in Canada or the United States.

(g) No Transfers to
Existing Tenants

(g)   Notwithstanding anything in this Lease to the contrary, Tenant shall not be permitted without the written consent of Landlord to effect a Transfer to any third party currently occupying space in the Property.

(h) Affiliated Transfers

(h)   Notwithstanding the foregoing provisions of this Paragraph 7 to the contrary, Tenant may, without Landlord's approval or consent (i) assign this Lease in its entirety to any Affiliate of Tenant (as defined below), and/or (ii) enter into any of the transactions deemed an "assignment" pursuant to the provisions of Paragraph 7(f) above (which is other than the dissolution of the entity which currently comprises the Tenant without immediate reconstitution thereof) with any such Affiliate, subject to the following conditions:  (A) such assignment is not a subterfuge by Tenant to (1) avoid its obligations under this Lease or this Paragraph 7, or (2) adversely affect the ability of Tenant to satisfy its obligations under this Lease or this Paragraph 7; (B) the Affiliate shall have assets and a tangible net worth at least equal to ten (10) times an amount equal to the total Base Rent due under this Lease for the remainder of the Term of this Lease as of the effective date of such assignment or other transaction; (C) Tenant gives Landlord notice of any such assignment or other transaction, which notice shall include current financial statements of Tenant and such Affiliate which Tenant reasonably believes satisfies the assets and net worth requirement in clause (B) hereinabove, and certified as accurate by an officer or managing partner thereof; (D) any such assignment shall be subject and subordinate to all of the terms and provisions of this Lease, and any assignee under an assignment of this Lease shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord prior to the effective date of such assignment, all the obligations of Tenant under this Lease; and (E) such assignment shall not relieve Tenant from any of its obligations under this Lease.  Landlord shall keep any financial statements provided to Landlord under this Section 7(h) confidential and shall not disclose the same, other than to (i) Landlord's legal and accounting consultants, Landlord's property and asset managers or any prospective purchasers or lenders of the Building (and Landlord shall use commercially reasonable efforts to cause such parties to keep such financial statements confidential), or (ii) as required by Applicable Law or as may reasonably be required in the course of any judicial or governmental proceeding (including in response to a subpoena).  Under no circumstances shall any such assignment to an Affiliate pursuant to the foregoing provisions of this Paragraph 7(h) be subject to Landlord's right to cancel and terminate this Lease pursuant to Paragraph 7(b) above or receive any Excess Transfer Rent pursuant to Paragraph 7(c) above.

As used herein:  (x) an "Affiliate" shall mean (I) a parent or subsidiary of Tenant, (II) any person or entity which controls, is controlled by or is under common control with Tenant, (III) any entity which purchases all or substantially all of the assets and/or stock or ownership interests of Tenant, or (IV) any entity into which Tenant is merged or consolidated; and (y) "control" shall mean the possession, direct or indirect, of the power to cause the direction of the management and policies of a person or entity, or ownership of any sort, whether through the ownership of voting securities, by contract or otherwise.

## 8.   REPAIR & DAMAGE

(a) Landlord's Repairs
to Building and
Property

(a)   Landlord covenants with Tenant to keep in a good and reasonable state of repair and decoration the following, the cost of which shall be included in Operating Costs to the extent provided for in Schedule "D":

(i)   those portions of the Property located outside the Building and the Related Buildings consisting of the entrances, lobbies, stairways, corridors, landscaped areas, parking areas, and other facilities from time to time provided for use in common by Tenant and other tenants of the Building or Property, and the exterior portions (including foundations and roofs) of all buildings and structures from time to time forming part of the Property and affecting its general appearance; and

(ii)   the "Base Building", which for purposes hereof shall mean, collectively, the base, shell and core components of the Building, including (A) the structural elements and exterior glass of the Building, (B) the elevators and escalators (if any), entrances, lobbies, stairways, corridors and washrooms from time to time provided for use in common by Tenant and other tenants of the Building, (C) the electrical, plumbing, mechanical, sprinkler life safety and other systems and

INITIAL ___

Landlord      |      Tenant

equipment of the Building provided for use in common by Tenant and other tenants of the Building wherever located and including such systems as solely serve the Tenant but not located within the Premises, and (D) the systems provided for bringing utilities to the perimeter of the Leased Premises.

**(b) Landlord's Repairs to the Leased Premises**

(b)   Landlord covenants with Tenant to repair, so far as reasonably feasible, and as expeditiously as reasonably feasible, defects in standard demising walls or in structural elements, exterior walls of the Building, suspended ceiling, electrical and mechanical installations standard to the Building installed by Landlord in the Leased Premises (if and to the extent that such defects are sufficient to impair Tenant's use of the Leased Premises while using them in a manner consistent with this Lease) and Insured Damage (as defined below).   Landlord shall in no event be required to make repairs to any Leasehold Improvements, trade fixtures, furniture, equipment or personal property installed in the Leased Premises, or to make repairs to wear and tear within the Leased Premises.   For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp).   Landlord shall not be deemed to have breached any obligation with respect to its covenant to repair unless Tenant has given to Landlord written notice of any required repair and Landlord has not made such repair within a reasonable time (given the circumstances) following the receipt by Landlord of such notice.

**(c) Tenant's Repairs**

(c)   Except as otherwise expressly provided in this Lease, Tenant covenants with Landlord to repair, maintain and keep at Tenant's own cost, except insofar as the obligation to repair rests upon Landlord pursuant to this paragraph or elsewhere in this Lease, the Leased Premises (including, without limitation, all Leasehold Improvements, trade fixtures, furniture, equipment and personal property installed therein) in good and substantial repair, reasonable wear and tear excepted, provided that this obligation shall not extend to the Base Building.   Landlord may enter the Leased Premises at all reasonable times with twenty-four (24) hours prior written notice, except in cases of emergency, and view the condition thereof and Tenant covenants with Landlord to repair, maintain and keep the Leased Premises in good and substantial repair according to notice in writing, reasonable wear and tear excepted.   If Tenant shall fail to commence repair as aforesaid within three (3) business days after notice to do so (or such shorter period in cases of emergency) and thereafter diligently prosecute such repair to completion, Landlord may effect the repairs and Tenant shall pay the actual cost thereof to Landlord on demand.   Tenant covenants with Landlord that Tenant will at the expiration of the Term or sooner termination thereof peaceably surrender the Leased Premises and appurtenances in good and substantial repair and condition, reasonable wear and tear, casualty and condemnation excepted.   It is the intention of the parties hereto that the terms of this Lease govern the respective obligations of the parties for the maintenance and repair of the Leased Premises, and Tenant hereby expressly waives the benefits of any Applicable Laws, now or hereafter in effect, to the extent inconsistent with the terms of this Lease, including, but not limited to, Tenant's right to make repairs, if at all, under Sections 1941 and 1942 of the California Civil Code, as may be amended or supplemented from time to time.

**(d) Indemnification**

(d)   If any part of the Property becomes out of repair, damaged or destroyed through the negligence of, or misuse by, Tenant or its employees, agents, licensees, invitees or others under its control, Tenant shall pay Landlord on demand the expense of repairs or replacements, including Landlord's reasonable administration charge thereof, necessitated by such negligence or misuse.

**(e) Damage and Destruction**

(e)   Landlord and Tenant agree that:

(i)   in the event of damage to the Property or to any part thereof, if in the reasonable opinion of Landlord the damage is such that the Leased Premises or any substantial part thereof is rendered not reasonably capable of use and occupancy by Tenant for the purposes of its business for any period of time in excess of ten (10) consecutive business days, then

(1)   unless the damage was caused by the fault or negligence of Tenant or its employees, agents, invitees or others under its control, from the date of occurrence of the damage and until the Leased Premises are again reasonably capable for use and occupancy as aforesaid, the Base Rent and Additional Rent payable pursuant to this Lease shall abate from time to time in proportion to the part or parts of the Leased Premises not reasonably capable of such use and occupancy, and


INITIAL

Landlord   |   Tenant

(2)  unless this Lease is terminated as hereinafter provided, Landlord or Tenant as the case may be (according to the nature of the damage and their respective obligations to repair as provided in Paragraphs 8(a), (b) and (c) above) shall repair such damage with all reasonable diligence, but to the extent that any part of the Leased Premises is not reasonably capable of such use and occupancy by reason of damage which Tenant is obligated to repair hereunder, any abatement of Rent to which Tenant would otherwise be entitled hereunder shall not extend later than the time by which, in the reasonable opinion of Landlord, repairs by Tenant ought to have been completed with reasonable diligence;

(ii)  if the damage is such that the Leased Premises are rendered untenantable, in whole or in part, and if, in the reasonable opinion of Landlord, the damage cannot be repaired with reasonable diligence within one hundred and eighty (180) days from the happening of the damage, then either party may, within thirty (30) days after (A) Landlord becomes aware of such damage, or (B) Tenant receives Landlord's repair estimate, as applicable, terminate this Lease by notice to the other party. Upon either party giving such notice, this Lease shall be terminated as of the date of such termination notice and the Rent and all other payments for which Tenant is liable under the terms of this Lease shall be apportioned and paid in full (subject to abatement as provided in Paragraph 8(e)(i) above) to the date of termination;

(iii)  Landlord shall not be required to use plans and specifications and working drawings used in the original construction of the Building and nothing in this Paragraph 8 requires Landlord to rebuild the Building in the condition and state that existed before the damage, but the Building, as rebuilt, will be of a reasonably similar or better quality and shall have reasonably similar facilities and services to those in the Building prior to the damage;

(iv)  if premises whether of Tenant or other tenants of the Property comprising in the aggregate half or more of the total number of square feet of rentable office area in the Property or half or more of the total number of square feet of rentable office area in the Building (as reasonably determined by Landlord) or portions of the Property which affect access or services essential thereto, are substantially damaged or destroyed by any cause and if in the reasonable opinion of Landlord the damage cannot reasonably be repaired within one hundred and eighty (180) days after the occurrence thereof, then Landlord may, by written notice to Tenant given within thirty (30) days after Landlord becomes aware of such damage or destruction, terminate this Lease, in which event: (1) neither Landlord nor Tenant shall be bound to repair as provided in Paragraphs 8(a), (b) and (c) above, and Tenant shall instead deliver up possession of the Leased Premises to Landlord with reasonable expedition but in any event within sixty (60) days after delivery of such notice of termination; and (2) Rent shall be apportioned and paid to the date upon which possession is so delivered up (but subject to any abatement to which Tenant may be entitled under Paragraph 8(e)(i) above);

(v)  if the Leased Premises or the Building is destroyed or damaged to any substantial extent during the last year of the Term of this Lease and if in the reasonable opinion of Landlord the damage cannot be repaired with reasonable diligence within the earlier of (A) sixty (60) days after the date of the damage and (B) the scheduled expiration date of the Term, then notwithstanding anything contained in this Paragraph 8(d), either party shall have the option to terminate this Lease by giving written termination notice to the other party of the exercise of such option within thirty (30) days after either party becomes aware of such damage or destruction, in which event this Lease shall terminate as of the date of such termination notice; and

(vi)  Landlord and Tenant hereby agree that the terms of this Lease will govern the effect of any damage to or destruction of the Leased Premises with respect to the termination of this Lease, and hereby waive any present or future Applicable Laws to the extent inconsistent herewith, including, but not limited to, Sections 1932(2) and 1933(4) of the California Civil Code (as may be amended or supplemented from time-to-time).

## 9.    INSURANCE AND LIABILITY

(a) Landlord's
Insurance

(a)    Landlord shall take out and keep in force during the Term insurance with respect to the Property except for (i) trade fixtures, furniture, equipment and personal property installed in the Leased Premises, and (ii) at Landlord's option, the Leasehold Improvements in the Leased Premises.  The insurance to be maintained by Landlord shall be in respect of perils and in amounts and on terms and conditions which from time to time are insurable at a reasonable premium and which are normally insured by reasonable prudent owners of properties similar to the Property, all as from time to time determined at reasonable intervals by insurance advisors selected by Landlord, and whose opinion shall be conclusive.  Unless and until the insurance advisors shall state that any such perils are not customarily insured against by owners of properties similar to the Property, the perils to be insured against by Landlord shall include, without



INITIAL
Landlord    |    Tenant

limitation, public liability, boilers and machinery, fire and extended perils and may include at the option of Landlord losses suffered by Landlord in its capacity as Landlord through business interruption.

(b) Tenant's
Insurance

(b)    Tenant shall take out and keep in force during the Term:

(i)    commercial general public liability insurance all on an occurrence basis with respect to the business carried on in or from the Leased Premises and Tenant's use and occupancy of the Leased Premises and of any other part of the Property, with coverage for any one occurrence or claim of not less than Five Million Dollars ($5,000,000) (which amount may be satisfied by a combination of primary and umbrella insurance policies) or such other amount as Landlord may reasonably require upon not less than one (1) month notice at any time during the Term, which insurance shall include Landlord as an additional insured and shall contain a cross liability clause protecting Landlord in respect of claims by Tenant as if Landlord were separately insured;

(ii)    insurance in respect of fire and such other perils as are from time to time in the usual extended coverage endorsement covering the Leasehold Improvements, trade fixtures, furniture, equipment and personal property in the Leased Premises for not less than the full replacement cost thereof, and which insurance shall include Landlord as a loss payee with respect to the Leasehold Improvements as Landlord's interest may appear; and

(iii)    insurance against such other perils and in such amounts as Landlord may from time to time reasonably require upon not less than ninety (90) days' written notice, such requirement to be made on the basis that the required insurance is customary at the time for prudent tenants of properties similar to the Property.

All insurance required to be maintained by Tenant shall be with insurers rated A- VI or better by A.M. Best and otherwise on terms reasonably satisfactory to Landlord. Each policy shall contain: (A) a cross liability clause; and (B) an undertaking by the insurer that no material change adverse to Landlord or Tenant will be made, and the policy will not lapse or be canceled, except after not less than thirty (30) days' written notice to Landlord of the intended change, lapse or cancellation; provided, however, that such 30-day period shall be reduced to ten (10) days in the event of a cancellation due to nonpayment of premium.    Tenant shall furnish to Landlord, if and whenever requested by it, certificates or other evidences reasonably acceptable to Landlord as to the insurance from time to time effected by Tenant and its renewal or continuation in force.   If Tenant shall fail to take out, renew and keep in force such insurance, then Landlord may give to Tenant written notice requiring compliance with this Paragraph 9(b) and specifying the respects in which Tenant is not then in compliance with this Paragraph 9(b).   If Tenant does not within forty-eight (48) hours after Tenant's receipt of written request or notice from Landlord provide Landlord with appropriate evidence of compliance with this Paragraph 9(b), then Landlord may (but shall not be obligated to) obtain some or all of the additional coverage or other insurance which Tenant shall have failed to obtain, without prejudice to any other rights of Landlord under this Lease or otherwise, and Tenant shall pay all premiums and other reasonable expenses incurred by Landlord to Landlord on demand.

(c) Limitation of
Landlord's
Liability

(c)    Tenant agrees that Landlord shall not be liable for any bodily injury or death of, or loss or damage to any property belonging to, Tenant or its employees, agents, invitees or licensees or any other person in, on or about the Property except to the extent resulting from the actual willful misconduct or gross negligence of Landlord or its own employees and not insured or required to be insured by Tenant under this Lease.   In no event, however, shall Landlord be liable for any damage, including indirect, special or consequential damages, which is caused by steam, water, rain or snow or other thing which may leak into, issue or flow from any part of the Property or from the pipes or plumbing works, including the sprinkler system (if any) therein or from any other place or for any damage caused by or attributable to the condition or arrangement of any electric or other wiring or of sprinkler heads (if any) or for any such damage caused by anything done or omitted by any other tenant, unless resulting from the gross negligence or willful misconduct of Landlord.

(d) Indemnity of
Landlord

(d)    Except with respect to claims or liabilities in respect of any damage which is Insured Damage to the extent of the cost of repairing such Insured Damage, Tenant agrees to indemnify, defend (with counsel reasonably acceptable to Landlord), protect and hold harmless Landlord and the Property in respect of:

(i) all claims for bodily injury or death, property damage or other loss or damage arising from the conduct of any work or any act or omission of Tenant or any assignee, subtenant, agent, employee, contractor, invitee or licensee of Tenant, and in respect of all costs, expenses and liabilities incurred by Landlord in connection with or arising out of all such claims, including the expenses of any action or proceeding pertaining thereto; and

(ii) any loss, cost (including, without limitation, reasonable attorneys' fees and costs, and court costs and disbursements, if any), expense or damage suffered by Landlord arising from any breach by Tenant of any of its covenants and obligations under this Lease.

(iii) The provisions of this Paragraph 9(d) shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

(e) Definition of
Insured
Damage

(e) For purposes of this Lease, "Insured Damage" means that part of any damage occurring to the Property of which the entire cost of repair (or the entire cost of repair other than deductible amount properly collectable by Landlord as part of the Additional Rent) is actually recovered by Landlord under a policy or policies of insurance from time to time effected by Landlord pursuant to Paragraph 9(a) above.

(f) Waiver of
Subrogation

(f) Landlord and Tenant agree to have their respective insurer(s) issuing property damage insurance and loss of income and extra expense insurance waive any rights of subrogation and indemnity that such companies may have against the other party. Notwithstanding any other provision of the Lease that would make Landlord or Tenant liable therefor, Landlord and Tenant hereby waive any right that they may have against the other, including recovery of deductible or self-retention amounts, as a result of any loss or damage caused by a risk insured or required to be insured under such policies.

(g) Indemnity of Tenant

Except with respect to claims or liabilities in respect of any damage which is Insured Damage to the extent of the cost of repairing such Insured Damage, and except to the extent caused by the negligence or willful misconduct of Tenant or and its parent, subsidiary and affiliated companies, including but not limited to their respective directors, officers, agents, servants, employees and independent contractors (collectively, the "Tenant's Group"), Landlord shall indemnify, defend, protect, and hold harmless Tenant and Tenant's Group from and against any and all loss, cost, damage, expense and liability (including, without limitation, court costs and reasonable attorneys' fees) to the extent arising from the gross negligence or willful misconduct of Landlord or of the contractors, agents, servants, employees or licensees of Landlord, either prior to, during, or after the expiration of the Term. The provisions of this Paragraph 9(g) shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

## 10.     EVENTS OF DEFAULT AND REMEDIES

(a) Events of
Default and
Remedies

(a) In the event of the happening of any one or more of the following events:

(i) Tenant shall have failed to pay an installment of Rent or any other amount payable hereunder when due, and such failure shall be continuing for a period of more than five (5) business days after written notice from Landlord to Tenant that such installment or amount was due; provided, however, that if Landlord has given Tenant two (2) such delinquency notices in the preceding twelve (12) month period, then Tenant's subsequent failure to pay any Rent or other amount when due shall constitute a default under this Lease without requirement of any notice or cure period; provided, further, that any such notice delivered by Landlord shall, at Landlord's option, be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any similar successor law;

(ii) there shall be a default of or with any condition, covenant, agreement or other obligation on the part of Tenant to be kept, observed or performed hereunder (other than the obligation to pay Rent or any other amount of money) and such default shall be continuing for a period of more than fifteen (15) days after written notice by Landlord to Tenant specifying the default and requiring that it be cured; provided however, that any such notice delivered by Landlord shall, at Landlord's


Landlord    |    Tenant

option, be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any similar or successor law; and provided further that if the nature of such default is such that the same cannot reasonably be cured within such 15-day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such 15-day period and thereafter diligently proceeds to rectify and cure said default as soon as reasonably possible; or

(iii) if any policy of insurance upon the Property or any part thereof from time to time effected by Landlord shall be canceled or is about to be canceled by the insurer by reason of the use or occupation of the Leased Premises by Tenant or any assignee, subtenant or licensee of Tenant or anyone permitted by Tenant to be upon the Leased Premises and Tenant after receipt of notice in writing from Landlord shall have failed to take such immediate steps in respect of such use or occupation as shall enable Landlord to reinstate or avoid cancellation (as the case may be) of such policy of insurance;

(iv) the Leased Premises shall, without the prior written consent of Landlord, be used by any other persons than Tenant or a permitted Transferee or for any purpose other than that for which they were leased or occupied or by any persons whose occupancy is prohibited by this Lease;

(v) the Leased Premises shall be abandoned without the prior written consent of Landlord for fifteen (15) consecutive days or more while capable of being occupied;

(vi) the balance of the Term of this Lease or any of the goods and chattels of Tenant located in the Leased Premises, shall at any time be seized in execution or attachment; or

(vii) if permitted by Applicable Laws, Tenant shall make any assignment for the benefit of creditors or become bankrupt or insolvent or take the benefit of any statute for bankrupt or insolvent debtors or, if a corporation, shall take any steps or suffer any order to be made for its winding-up or other termination of its corporate existence; or a trustee, receiver or receiver-manager or agent or other like person shall be appointed of any of the assets of Tenant;

then Landlord shall have the following rights and remedies all of which are cumulative and not alternative and not to the exclusion of any other or additional rights and remedies in law or equity available to Landlord by statute or otherwise:

(A)     to remedy or attempt to remedy any default of Tenant, and in so doing to make any payments due or alleged to be due by Tenant to third parties (including, without limitation, payments due to any contractor, workman, material and/or service suppliers performing any work in or for the Leased Premises), and to enter upon the Leased Premises to do any work or other things therein, and in such event all reasonable expenses of Landlord in remedying or attempting to remedy such default shall be payable by Tenant to Landlord on demand;

(B)     with respect to unpaid overdue Rent, to the payment by Tenant of the Rent and of interest (which said interest shall be deemed included herein in the term "Rent") thereon at a rate (the "Interest Rate") equal to the lesser of (1) three percent (3%) above the prime commercial loan rate charged to borrowers having the highest credit rating from time to time by Landlord's principal bank from the date upon which the same was due until actual payment thereof, and (2) the maximum amount allowed under the Applicable Laws of the jurisdiction in which the Building is located;

(C)     to terminate this Lease, in which event Tenant shall immediately surrender the Leased Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Leased Premises and expel or remove Tenant and any other person who may be occupying the Leased Premises or any part thereof, without being liable for prosecution or any claim or damages therefor, but in accordance with the Applicable Laws; and Landlord may recover from Tenant the following:

(I)     the worth at the time of award of any unpaid Rent which has been earned at the time of such termination; plus

(II)     the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(III)     the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus



INITIAL
Landlord     |     Tenant

(IV) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including, but not limited to, brokerage commissions and advertising expenses incurred, expenses reasonably incurred to remodel the Leased Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions reasonably incurred to obtain a new tenant; and

(V) at Landlord's sole election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by Applicable Laws.

(D) in the event of any breach by Tenant of any of the covenants or provisions of this Lease, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity, and mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy at law or in equity.

(E) pursue any remedy now or hereafter available under the Applicable Laws or judicial decisions of the jurisdiction in which the Building is located (including, but not limited to, California Civil Code Section 1951.4 [where a landlord may continue a lease in effect after a tenant's breach and recover rent as it becomes due, if the tenant has the right to sublet or assign, subject only to reasonable limitations]).

As used in clauses (C)(I) and (C)(II) hereinabove, the "worth at the time of award" shall be computed by allowing interest at a rate equal to the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). As used in clause (C)(III) hereinabove, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws if this Lease is terminated and/or Landlord obtains possession of the Leased Premises pursuant to the provisions of this Paragraph.

The expiration and termination of this Lease and/or the termination of Tenant's right to possession shall not relieve Tenant from liability under all of the indemnity provisions of the Lease as to matters occurring or accruing during the Term or by reason of Tenant's occupancy of the Leased Premises.

(b) Attorneys' Fees

(b) If either Landlord or Tenant, or both, brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the "prevailing party" (as hereinafter defined) in any such proceeding, action or appeal thereon, shall be entitled to the reimbursement of reasonable attorneys' fees and costs, and court costs. Such fees and costs may be awarded in the same suit or recovered in a separate suit whether or not such action or proceeding is pursued to decision, judgment, settlement or otherwise. The term "prevailing party" shall include, without limitation, either party hereto who substantially obtains or defeats the relief sought by decision, judgment or other third party resolution of the matter (i.e., by arbitration). The reasonable attorneys' fees award shall not be computed in accordance with any court fee schedule but shall be such as to fully reimburse all attorneys' fees and costs, and court costs, reasonably incurred by the prevailing party.

## 11. COMMON AREAS

Tenant acknowledges and agrees that the common areas of the Building and Property shall at all times be subject to the exclusive management and control of Landlord. Without limiting the generality of the foregoing, Tenant specifically acknowledges and agrees that Landlord may temporarily close or restrict the use of all or any part of the common areas of the Building and Property in an emergency, or for security or crowd control purposes, to facilitate tenants moving in or out of the Building and/or Property, or for the purpose of making repairs, alterations or renovations. Landlord agrees not to permanently alter such common areas in any manner which would deny reasonable access to the Leased Premises. In the event of any such temporary closure or restriction of use or if changes are made to such common areas by Landlord, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or any diminution or abatement of Rent and such closures, restriction and changes shall not be deemed to be a constructive or actual eviction or a breach of Landlord's covenant for quiet enjoyment. Notwithstanding the foregoing, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's use of and access to the Premises when exercising its rights under this Paragraph 11.

## 12. RELOCATION OF LEASED PREMISES

Landlord shall have the right at any time upon sixty (60) days' written notice (the "Notice of Relocation") to relocate the third (3rd) floor portions of the Leased Premises to other premises in the Property (the "Relocated Premises") and the following terms and conditions shall be applicable:

(a)     the Relocated Premises shall contain approximately the same as, or greater Rentable Area than, such portion of the Leased Premises;

(b)     Landlord shall provide at its expense leasehold improvements in the Relocated Premises equal to the standards of the Leasehold Improvements in such portion of the Leased Premises which have been completed or which Landlord is obliged herein to provide in such portion of the Leased Premises;

(c)     Landlord shall pay for the reasonable moving costs (if any) from such portion of the Leased Premises to the Relocated Premises of Tenant's trade fixtures and furnishings;

(d)     as compensation for all other costs, expenses and damages which Tenant may suffer or incur in connection with the relocation including disruption and loss of business, Basic Rent and Additional Rent for the Relocated Premises for the period of the first one (1) month of occupancy shall abate;

(e)     during the remaining Term of the Lease but not including any renewals of the Lease, the Basic Rent and Tenant's Proportionate Share of Additional Rent for the Relocated Premises shall be no greater than the Basic Rent and Tenant's Proportionate Share of Additional Rent for the Leased Premises, notwithstanding the Relocated Premises may contain a greater Rentable Area;

(f)     all other terms and conditions of the Lease shall apply to the Relocated Premises except as are inconsistent with the terms and conditions of this subparagraph; and

(g)     Tenant agrees to execute Landlord's standard form of lease amendment then being used by Landlord for the Building to give effect to the relocation.

### 13.     SUBORDINATION AND ATTORNMENT

Unless the lessor or beneficiary of any ground lease or deed of trust elects in writing that this Lease be superior thereto, this Lease and all rights of Tenant hereunder are subject and subordinate to all ground leases and deeds of trust which may now or hereafter affect the Property or any part thereof and to all renewals, modifications, consolidations, replacements and extensions thereof provided the lessor or beneficiary thereunder agrees to accept this Lease if not in default; and in recognition of the foregoing Tenant agrees that it will, whenever requested, attorn to such lessor or beneficiary as a tenant upon all the terms of this Lease. Tenant agrees to execute promptly whenever requested by Landlord or by lessor of any such ground lease or beneficiary under such deed of trust an instrument of subordination or attornment as may be required of it. In consideration of and as a condition precedent to Tenant's agreement to be bound by this Paragraph 13, Landlord shall use commercially reasonable efforts and diligence to provide Tenant with a commercially reasonable form of subordination, non-disturbance and attornment agreement ("SNDA") from any subsequent ground lessor or beneficiary under a deed of trust encumbering the Property, who later may come into existence during the Term. Tenant hereby expressly waives the provisions of any statute, rule or law which may give or purport to give Tenant the right or election to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder solely in the event of any foreclosure proceeding or sale, and Tenant hereby agrees that this Lease shall not be affected in any way whatsoever by and such foreclosure proceeding or sale

### 14.     ESTOPPEL CERTIFICATES

Tenant agrees that it shall promptly whenever requested by Landlord from time to time execute and deliver to Landlord, and if required by Landlord, to any existing or prospective ground lessor of the Property, any existing or prospective beneficiary of a deed of trust encumbering the Property, any prospective purchaser of the Property or any interest in Landlord, or any other person or entity designated by Landlord, an estoppel certificate certifying as to the then status of this Lease, including as to whether it is in full force and effect, is modified or unmodified, confirming the Rent payable hereunder and the state of the accounts between Landlord and Tenant, the existence or non-existence of defaults, and any other matters pertaining to this Lease as to which Landlord shall reasonably request.

### 15.     INSPECTION OF AND ACCESS TO LEASED PREMISES

Landlord shall be permitted at any time and from time to time with twenty-four (24) hours prior notice (except in emergency situations) by e-mail to enter and to have its authorized agents, employees and contractors enter the Leased Premises for the purposes of inspection, window cleaning, maintenance, providing janitor service, making repairs, alterations or improvements to the Leased Premises or the Property, or to have access to utilities and services (including all ducts and access panels, if any, which Tenant agrees not to obstruct) and Tenant shall provide free and unhampered access for the purpose, and shall not be entitled to compensation or any diminution or abatement of Rent for any inconvenience, nuisance or discomfort caused thereby. Landlord and its authorized agents and employees shall be

INITIAL

Landlord          Tenant

DocuSign Envelope ID: F58359BB-95A0-4609-BA1D-1C352B45D676

permitted entry to the Leased Premises for the purpose of exhibiting them to prospective tenants with twenty-four (24) hours prior notice by e-mail. Landlord in exercising its rights under this paragraph shall do so to the extent reasonably necessary so as to minimize interference with Tenant's use and enjoyment of the Leased Premises provided that in an emergency Landlord or persons authorized by it may enter the Leased Premises without regard to minimizing interference.

### 16. DELAY

Except as herein otherwise expressly provided, if and whenever and to the extent that Landlord shall be prevented, delayed or restricted in the fulfillment of any obligation hereunder in respect of the supply or provision of any service or utility, the making of any repair, the doing of any work or any other thing by reason of any of the following that is not caused by the acts or omissions of Landlord:

    (a)    strikes or work stoppages,

    (b)    being unable to obtain any material, service, utility or labor required to fulfill such obligation,

    (c)    governmental action or inability to obtain (or delays in obtaining beyond the reasonable normal processing time) any permission from any government authority having lawful jurisdiction, or

    (d)    acts of God, civil commotion and other causes beyond the reasonable control of Landlord,

then the time for fulfillment of such obligation shall be extended during the period in which such circumstance operates to prevent, delay or restrict the fulfillment thereof, and Tenant shall not be entitled to compensation for any inconvenience, nuisance or discomfort thereby occasioned; provided that nevertheless Landlord will use commercially reasonable efforts to maintain services essential to the use and enjoyment of the Leased Premises.

### 17. WAIVER

If either Landlord or Tenant shall overlook, excuse, condone or suffer any default, breach, non-observance, improper compliance or non-compliance by the other of any obligation hereunder, this shall not operate as a waiver of such obligation in respect of any continuing or subsequent default, breach, or non-observance, and no such waiver shall be implied but shall only be effective if expressed in writing.

### 18. SALE, DEMOLITION AND RENOVATION

The term "Landlord" as used in this Lease, means only the owner for the time being of the Property, so that in the event of any sale or sales or transfer or transfers of the Property, or the making of any lease or leases of the entire Property, or the sale or sales or the transfer or transfers or the assignment or assignments of any such lease or leases, previous landlords shall be and hereby are relieved of all covenants and obligations of Landlord hereunder. It shall be deemed and construed without further agreement between the parties, or their successors in interest, or between the parties and the transferee or acquirer, at any such sale, transfer or assignment, or lessee on the making of any such lease, that the transferee, acquirer or lessee has assumed and agreed to carry out any and all of the covenants and obligations of Landlord hereunder to Landlord's exoneration, and Tenant shall thereafter be bound to and shall attorn to such transferee, acquirer or lessee, as the case may be, as Landlord under this Lease;

### 19. PUBLIC TAKING

Landlord and Tenant shall co-operate, each with the other, in respect of any Public Taking of the Leased Premises or any part thereof so that Tenant may receive the maximum award to which it is entitled in law for relocation costs and business interruption and so that Landlord may receive the maximum award for all other compensation arising from or relating to such Public Taking (including all compensation for the value of Tenant's leasehold interest subject to the Public Taking) which shall be the property of Landlord, and Tenant's rights to such compensation are hereby assigned to Landlord. If the whole or any part of the Leased Premises is Publicly Taken, as between the parties hereto, their respective rights and obligations under this Lease shall continue until the day on which the Public Taking authority takes possession thereof. If the whole or any part of the Leased Premises is Publicly Taken, Landlord shall have the option, to be exercised by written notice to Tenant, to terminate this Lease and such termination shall be effective on the day the Public Taking authority takes possession of the whole or the portion of the Property Publicly Taken. Rent and all other payments shall be adjusted as of the date of such termination and Tenant shall, on the date of such Public Taking, vacate the Leased Premises and surrender the same to Landlord, with Landlord having the right to re-enter and re-possess the Leased Premises discharged of this Lease and to remove all persons there from. In this paragraph, the words "Public Taking" shall include expropriation and condemnation and shall include a sale by Landlord to an authority with powers


INITIAL
Landlord  |  Tenant

of expropriation, condemnation or taking, in lieu of or under threat of expropriation or taking and "Publicly Taken" shall have a corresponding meaning. Notwithstanding anything to the contrary set forth in this Paragraph 19, Tenant hereby waives any and all rights that Tenant might otherwise have pursuant to Sections 1265.110, 1265.120, 1265.130 and/or 1265.140, et seq. (and otherwise in connection therewith) of the California Code of Civil Procedure, as may be amended or supplemented from time to time.

## 20.   REGISTRATION OF LEASE

Tenant agrees with Landlord not to register or record this Lease in any recording office and not to register or record any notice of this Lease in any form without the prior written consent of Landlord (which consent may be withheld in Landlord's sole and absolute discretion).  If such consent is provided, such notice or document to be registered or recorded shall be in such form as Landlord shall have approved and upon payment of Landlord's reasonable fee for same and all applicable transfer and recording taxes and charges.  Tenant shall remove and discharge at Tenant's expense any such registration and/or recording of such notice or other document at the expiration or earlier termination of the Term, and if Tenant fails to do so within ten (10) days after written notice by Landlord to Tenant, then Landlord may in the name and on behalf of Tenant execute and register or record such document as necessary to discharge and remove such notice or other document, and for the purpose thereof Tenant hereby irrevocably constitutes and appoints any officer of Landlord the true and lawful attorney of Tenant.

## 21.   LEASE ENTIRE AGREEMENT

Tenant acknowledges and agrees that (a) there are no covenants, representations, warranties, agreements or conditions express or implied, collateral or otherwise forming part of or in any way affecting or relating to this Lease except as expressly set forth in this Lease and the Schedules attached hereto, (b) this Lease and such Schedules constitute the entire agreement between Landlord and Tenant and may not be modified except as herein explicitly provided or except by agreement in writing executed by Landlord and Tenant.

## 22.   NOTICES

Any notice, advice, document or writing required or contemplated by any provision hereof shall be given in writing and if to Landlord, either delivered personally to an officer of Landlord or mailed by prepaid mail (return receipt requested) addressed to Landlord at the address of Landlord as stated below, and if to Tenant, either delivered personally to Tenant (or to an officer of Tenant, if a corporation) or mailed by prepaid mail (return receipt requested), or sent via reputable overnight courier service (e.g., Federal Express, UPS, Overnite Express), addressed to Tenant at the address as stated below.  Every such notice, advice, document or writing shall be deemed to have been given upon receipt or refusal to accept delivery.  Landlord may from time to time by notice in writing to Tenant designate another address as the address to which notices are to be mailed to it, or specify with greater particularity the address and persons to which such notices are to be mailed and may require that copies of notices be sent to an agent designated by it.  Tenant may from time to time by notice in writing to Landlord, designate another address as the address to which notices are to be mailed to it, or specify with greater particularity the address to which such notices are to be mailed.

|  |  |
|---|---|
| NOTICES TO LANDLORD: | John Hancock Life Insurance Company (U.S.A.) |
|  | 10180 Telesis Court, Suite 150 |
|  | San Diego, California 92121 |
|  | Attn:  Property Manager |
| NOTICES TO TENANT: | Huawei Device USA Inc. |
|  | 10180 Telesis Court, Suite 400 |
|  | San Diego, California 92121 |
|  | Attn:  Yan Jin |
|  | With copies to: |
|  | Dong Bo |
|  | V.P. of Operations |
|  | Huawei Device |
|  | 5700 Tennyson, Suite 600 |
|  | Plano, TX 75024 |
|  | Legal Department |
|  | Huawei Device |
|  | 5700 Tennyson, Suite 600 |
|  | Plano, TX 75024 |

INITIAL

Landlord    |    Tenant

DocuSign Envelope ID: F63359BB-85A9-4609-B41D-C352B4E0676

## 23.    INTERPRETATION

In this Lease "herein", "hereof"', "hereby", "hereunder", "hereto", "hereinafter" and similar expressions refer to this Lease and not to any particular paragraph, clause or other portion thereof, unless there is something in the subject matter or context inconsistent therewith; and the parties agree that all of the provisions of this Lease are to be construed as covenants and agreements as though words importing such covenants and agreements were used in each separate paragraph hereof, and that should any provision or provisions of this Lease be illegal or not enforceable it or they shall be considered separate and severable from this Lease and its remaining provisions shall remain in force and be binding upon the parties hereto as though the said provision or provisions had never been included, and further that the captions appearing for the provisions of this Lease have been inserted as a matter of convenience and for reference only and in no way define, limit or enlarge the scope or meaning of this Lease or of any provisions hereof.

## 24.    EXTENT OF LEASE OBLIGATIONS

This Lease and everything herein contained shall inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors, assigns and other legal representatives, as the case may be, of each and every of the parties hereto, subject to the granting of consent by Landlord to any Transfer, and every reference herein to any party hereto shall include the heirs, executors, administrators, successors, assigns and other legal representatives of such party, and where there is more than one tenant or there is a male or female party the provisions hereof shall be read with all grammatical changes thereby rendered necessary and all covenants shall be deemed joint and several.

## 25.    LIMITATION ON LANDLORD LIABILITY

Notwithstanding any other provision of this Lease to the contrary, it is expressly understood and agreed that the total liability of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant hereunder and/or Tenant's use of the Leased Premises, shall be limited to the estate of Landlord in the Property, including any rent or other income associated therewith.  No other property or asset of Landlord or any partner, member, officer, director, shareholder or owner of Landlord shall be subject to judgment, levy, execution, and/or other enforcement proceedings or other judicial process for the satisfaction of any judgment or any other right or remedy of Tenant arising out of or in connection with this Lease, the relationship of Landlord and Tenant hereunder and/or Tenant's use of the Leased Premises.

## 26.    WAIVER OF JURY TRIAL

**TO THE EXTENT PERMITTED BY APPLICABLE LAWS, TENANT HEREBY WAIVES TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE AND OCCUPANCY OF THE LEASED PREMISES.**

## 27.    CHOICE OF LAW

(a)    This Lease shall be construed and enforced in accordance with, and governed by, the laws of the State of California.  Landlord and Tenant hereby consent and agree to the jurisdiction of the state or federal courts sitting in the county in which the Property is located, and waive any objection based on venue or forum non conveniens with respect to any action instituted herein, and further agree that any dispute concerning the relationship between the parties hereto or this Lease, or otherwise, shall be heard only in the courts described above.

(b)    This Lease will be construed without regard to any presumption or other rule requiring construction against the party drafting the document, and shall be construed neither for nor against Landlord or Tenant, but will be given a reasonable interpretation in accordance with the plain meaning of its terms and the intent of the parties hereto.

(c)    This Lease will have no binding force or effect until its execution and delivery by both Landlord and Tenant.

## 28.    TERRORISM, MONEY LAUNDERING, CORRUPT PRACTICES DISCLOSURE

Notwithstanding anything to the contrary set forth in the Lease, it shall be a material and non-curable breach and default of this Lease by Tenant, providing for Landlord's immediate termination of same upon Landlord's written notice to Tenant (at Landlord's sole and absolute discretion), if:  (a) Tenant is, or was at any time, subject to sanctions of the United States government in violation of any Applicable Laws



INITIAL

Landlord    |    Tenant

relating to bribery, federal corrupt practices, terrorism or money laundering, including, without limitation, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order") and/or the Uniting and Strengthening of America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, et. seq., the "Patriot Act"), as may be amended or supplemented from time to time; and/or (b) Tenant is, or ever was at any time, a "Prohibited Person", which term is defined as follows:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions, of the Executive Order; (iii) a person or entity with whom Landlord is prohibited from dealing or otherwise engaging in any transaction by any terrorism or anti-money laundering law, including the Executive Order and/or the Patriot Act; (iv) a person or entity who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (v) a person or entity that is named as a "specially designated national and/or blocked person" on the most-current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or any replacement website or other official replacement publication of such list.

## 29.    TRANSPORTATION, ENVIRONMENTAL SUSTAINABILITY AND ENERGY SAVINGS

(a)    Tenant shall, at Tenant's cost and expense (whether billed directly to Tenant on an individual basis or passed through to Tenant as a part of Operating Costs), fully comply with all reasonable programs intended to manage parking, transportation and/or traffic in and around the Building and the Property, and in connection therewith, Tenant will take responsible action for the transportation, planning and management of all employees located at the Leased Premises by working directly with Landlord, any governmental transportation management organization and/or any other transportation-related committees or entities.  Such programs may include, without limitation: (i) restrictions on the number of peak-hour vehicle trips generated by Tenant; (ii) increased vehicle occupancy; (iii) implementation of an in-house ridesharing program and an employee transportation coordinator; and/or (iv) utilizing flexible work shifts for employees.

(b)    Tenant shall also, at Tenant's cost and expense (whether billed directly to Tenant on an individual basis or passed through to Tenant as a part of Operating Costs), fully comply with all reasonable programs at the Property intended to accomplish savings in resources, achieve certain energy efficiency benchmarks and/or certifications, reduce waste, improve efficiency of utilities, implement alternative energy policies, monitor utility use, source reduction and recycling, pollution reduction, improve efficiency and sustainability of waste storage and transport, and train its staff in connection with the foregoing.  Such programs may include, without limitation:  (i) programs to achieve LEED certification, ENERGY STAR ratings, and/or other certifications, ratings or qualifications; (ii) setting and complying with flow rates and flush volumes for water use; (iii) irrigation systems set at the lowest rate to keep plants healthy, use of grey water or on-site treated water, and use of rain gauges and/or soil moisture sensors; (iv) installation of occupancy or motion sensors and coordination thereof to reduce utility use; (v) Landlord having the right to hire an engineer for a Building study or studies to increase Building system performance and reduce energy use; (vi) retrofits and improvements (such as solar panels and other harnessers of renewable sources of energy) to optimize energy performance and Building efficiency; (v) establishment by Landlord and compliance by Tenant with an energy optimization plan, which may include, without limitation, monitoring and reporting requirements and recalibration of service levels; (vi) procurement of renewable energy through use of on-site technology or through the use or procurement of green power from a utility provider; (vii) installation and repair and replacement of metering; (viii) preventive maintenance with respect to Building systems; (ix) linking of systems (including, without limitation, Tenant's systems) to Landlord's systems if requested by Landlord in order to accomplish energy management, workspace environmental management and other related goals; (x) maintaining a record with respect to the amount, type, transportation, and ultimate place of disposal of waste; (xi) separation/segregation (including, without limitation, composting) of waste material and implementing different systems for each type of waste; (xi) Landlord establishing and Tenant complying with rules for storage and use of chemicals; and/or (xii) reduction of mercury in the Building by use of low mercury lamps.

## 30.    BUILDING TOP SIGNAGE

Subject to this Paragraph 30, Tenant shall be entitled to install, at its sole cost and expense, one (1) "building top" sign on the exterior of the Building with the name "Huawei" and/or Tenant's logo (the "Signage") in one (1) of the locations shown on Schedule "L" attached hereto (and Tenant shall notify Landlord of which of such locations it selects as part of the Signage Specifications submitted to Landlord as set forth below).  Within ten (10) months of the Commencement Date, Tenant shall notify Landlord, in writing, as to whether or not Tenant will install the Signage in accordance with the provisions of this Section 13.  Tenant's failure to deliver such notice within such ten (10) month period shall be deemed to be Tenant's election not to install the Signage.  If Tenant elects (or is deemed to have elected) not to

install the Signage, the rights described in this Paragraph 30 shall terminate and be of no further force and effect. The graphics, materials, size, color, design, lettering, lighting (if any) and specifications of the Signage (collectively, the "Signage Specifications") shall be subject to the prior written approval of Landlord, which approval shall not be unreasonably withheld (however, Landlord approves the name, logo and colors shown on Schedule "M" attached hereto). In addition, the Signage and all Signage Specifications therefor shall be subject to Tenant's receipt of all required governmental permits and approvals, shall be subject to all applicable governmental laws and ordinances, and all covenants, conditions and restrictions affecting the Building. Tenant hereby acknowledges that, notwithstanding Landlord's approval of the Signage and/or the Signage Specifications therefor, Landlord has made no representations or warranty to Tenant with respect to the probability of obtaining such approvals and permits. In the event Tenant does not receive the necessary permits and approvals for the Signage, Tenant's and Landlord's rights and obligations under the remaining provisions of this Amendment shall not be affected. The cost of installation of the Signage, as well as all costs of design and construction of such Signage and all other costs associated with such Signage, including, without limitation, permits, maintenance and repair, shall be the sole responsibility of Tenant (except as provided in Schedule "F"). Notwithstanding anything to the contrary contained herein, in the event that at any time during the Term of the Lease, Tenant fails to occupy at least 20,000 rentable square feet in the Building, Tenant's right to the Signage shall thereupon terminate and Tenant shall remove such Signage as provided in this Paragraph 30. The rights to the Signage shall be personal to the original Tenant executing this Amendment (and any Affiliated Party) and may not be otherwise transferred. Should the Signage require maintenance or repairs as determined in Landlord's reasonable judgment, Landlord shall have the right to provide written notice thereof to Tenant and Tenant shall cause such repairs and/or maintenance to be performed within thirty (30) days after receipt of such notice from Landlord at Tenant's sole cost and expense. Should Tenant fail to perform such maintenance and repairs within the period described in the immediately preceding sentence, Landlord shall have the right to cause such work to be performed and to charge Tenant for the cost of such work. Upon the expiration or earlier termination of the Lease (or the termination of the Signage right as described above), Tenant shall, at Tenant's sole cost and expense, cause the Signage to be removed from the exterior of the Building and shall cause the exterior of the Building to be restored to the condition existing prior to the placement of such Signage. If Tenant fails to remove such Signage and to restore the exterior of the Building as provided in the immediately preceding sentence within thirty (30) days following the expiration or early termination of the Lease, then Landlord may perform such work, and all costs and expenses incurred by Landlord in so performing such work shall be reimbursed by Tenant to Landlord within ten (10) days after Tenant's receipt of invoice therefor. The immediately preceding sentence shall survive the expiration or earlier termination of the Lease.

Should the name of the original Tenant executing this Amendment or should the Lease be assigned to any Affiliated Party, then the Signage may be modified at Tenant's sole cost and expense to reflect the new name, provided that the new name is reasonably acceptable to Landlord, and without limiting other reasonable grounds for which Landlord may disapprove the new name, Landlord may disapprove the new name if it (i) relates to an entity that is of a character or reputation, or associated with a political orientation or a faction, that is inconsistent with the quality of the Building or would otherwise reasonably offend an institutional landlord of an office project comparable to the Building, taking into consideration the level and visibility of such signage or (ii) causes Landlord to be in default under any lease or license with another tenant of the Building.

## 31. EXISTING LEASE

Landlord and Tenant acknowledge and agree that Tenant currently occupies, and as of the date immediately preceding the Commencement Date, will occupy, the Premises pursuant to that certain Office Lease dated July 20, 2005 (the "Existing Lease") by and between Seaview PFG, LLC (as predecessor to Landlord) and Futurewei Technologies, Inc., (as predecessor to Tenant), as amended; consequently, Landlord shall have no obligation to deliver possession of the Premises to Tenant on the Commencement Date and Tenant hereby waives any and all claims Tenant may have with respect to the condition of the Premises as of the Commencement Date. Additionally, Tenant hereby agrees and acknowledges that the Tenant Improvements constructed pursuant to Section 5 of Schedule "F" shall be constructed during the term of the Existing Lease and that the performance of such work shall not be deemed a constructive eviction of Tenant under the Existing Lease nor shall Tenant be entitled to any abatement of rent under the Existing Lease in connection therewith. In addition, Landlord shall not be liable for any damage to property, injury to persons, or damage to Tenant's business caused by the completion of the Tenant Improvements during the term of the Existing Lease.

## 32. RESTRICTION ON SALE AND LEASING

So long as Tenant is not in default hereunder, in no event during the Term or any extension thereof shall Landlord lease, sell or transfer all or any portion of the Building or any Related Buildings (so long as Landlord owns such Related Buildings) to ZTE Corporation or any ZTE Affiliates and a breach thereof shall constitute a default of Landlord hereunder and shall entitle Tenant to injunctive relief. For the

DocuSign Envelope ID: F68359BB-65A9-4609-B41D-C352B4FD0676

purposes of this Lease, the term "ZTE Affiliates" shall mean any entity who, directly or indirectly, controls, is controlled by or is under common control with, ZTE Corporation.

## 33.    SCHEDULES

The provisions of the following Schedules attached hereto shall form part of this Lease as if the same were embodied herein:

| | |
|---|---|
| Schedule "A" | Location of Leased Premises |
| Schedule "B" | Measurement of Rentable Area |
| Schedule "C" | Taxes Payable by Landlord and Tenant |
| Schedule "D" | Services and Costs |
| Schedule "E" | Rules and Regulations |
| Schedule "F" | Leasehold Improvements |
| Schedule "H" | Right of First Offer |
| Schedule "I" | Parking License |
| Schedule "J" | Termination Option |
| Schedule "K" | Option to Renew |
| Schedule "L" | Location of Signage |
| Schedule "M" | Approved Logo and Colors |

*[SIGNATURES CONTAINED ON THE FOLLOWING PAGE]*

IN WITNESS WHEREOF the parties hereto have executed this Lease.

Landlord:

JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.), a Michigan corporation

by Signature

Title:       Raymond Rothfelder
Name:        Managing Director, Western U.S.


Tenant:

HUAWEI DEVICE USA, INC.
a Texas corporation

by Signature

Title:       President
Name:        Zhendong Zhu

# SCHEDULE "A"

(Location of Leased Premises cross-hatched)

This Schedule is for identification purposes only and is not to be interpreted as being a representation or warranty on the part of Landlord as to the exact location, area, configuration and layout.



JHL1/22/2014 968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE A
-1-

INITIAL
Landlord | Tenant







SUITE
400

400  HuaWei
Usable : 18167
Rentable : 19143

Current
Lease   N/A

FLOOR 4 

10180 Telesis Court
10180 Telesis Court
San Diego, CA  92121

STEVENSON
SYSTEMS INC
stevensonsystem.com
18011       SF
©1984-2013 ALL RIGHTS RESERVED

8/23/13          FINAL COMPOSITE

JHL1/22/2014 968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE A
-3-

INITIAL
Landlord    |    Tenant

## SCHEDULE "B"

### (Measurement of Rentable Area)

Building Perimeter & Interior Gross Area (IGA)

Generally and in accordance with the standards of the Building established by Landlord the Building Perimeter shall be determined at the dominant portion of the inside finished surface of a vertical exterior enclosure that constitutes 50% or more of the vertical dimension between the finished surface of the floor and the finished surface of the ceiling. The dominant portion is determined at each point along the horizontal length of the enclosure establishing a series of points. Once connected, the services of points form a horizontal line that constitutes the Building Perimeter. The area within the Building Perimeter is the Interior Gross Area (IGA).

Major Vertical Penetrations

Major Vertical Penetrations are openings in the floor in excess of one (1) square foot that serve vertical building systems or vertical occupant circulation functions; such as stairwells, elevator shafts, pipe shafts, vertical ventilation ducts and their enclosing walls. For purposes of this Lease, Major Vertical Penetrations are not a part of the Rentable Area of the Leased Premises.

Usable Area

Usable Area is defined as a portion of a building where an occupant normally houses personnel, equipment, fixtures, furniture, supplies goods or merchandise. The Usable Area of an Occupant Suite is determined at the Building Perimeter, core, corridor, and/or demising wall between occupant suites, excluding Major Vertical Penetrations, Service Areas such as toilets, floor or building electrical closets, mechanical rooms and the like. Door Setbacks at entrances to Usable Area are included in its area. Single Floor Occupants have effective use of the elevator lobby and any areas that are currently constructed or might be constructed or required for corridors and are included as a part of the Usable Area on Single Occupant Floors.

On Multi-Occupant Floors, any area (extended corridor) located outside the physical enclosing walls of an occupant's Leased Premises and between it and the minimum corridor necessary for access to and egress from occupant areas, stairs, elevators and the like shall be Usable Area. Demised occupant suites may receive a proportionate share of the extended corridor as Usable Area.

On Multi-Occupant Floors, the boundary line for Usable Area between individual adjacent suites shall be determined or measured to the centerline of the walls that separate them.

Floor Service or Floor Common Areas

Floor Service or Floor Common Areas are the portions of a specific floor that provides services that enable occupants to work on that floor. Floor Service Areas include but are not limited to the following areas that primarily service only the floor upon which they are located: restrooms, janitorial closets, electrical & telephone closets, mechanical rooms, and on Multi-Occupant Floors the elevator lobby and the minimum corridor necessary for access to and egress from occupant areas, stairs, elevators and the like.

Building Service or Building Common Areas

Building Service or Building Common Areas are the portions of a building that provides services that enable occupants to work in the building. Building Service Areas include but are not limited to the following areas that serve the entire building: main & auxiliary lobbies, building corridors, fire control rooms, loading docks, building restrooms, building janitorial closets, building electrical & telephone closets, building mechanical rooms, building storage and building offices.

Single Occupant Floor

The Rentable Area of a single occupant floor is equal to the Usable Area of the floor plus the Floor Service Area and a proportionate share of Building Service Area apportioned in accordance with the standards of the Building established by Landlord. Single Floor Occupants have effective use of the elevator lobby and any areas that are currently constructed or might be constructed or required for corridors and are included as a part of the Usable Area on Single Occupant Floors. Where the space on both sides of a wall is Rentable Area, the wall is to be included in the Rentable Area. No deductions shall be made for columns and projections necessary to the Building.

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE "B"
-1-

P:01070025-4:12252.011

INITIAL
Landlord    |    Tenant

DocuSign Envelope ID: F6B359BB-6EA9-4609-841D-1C352B45D676

<u>Multi-Occupant Floor</u>

The Rentable Area of a multi-occupant floor is equal to the Usable Area of the demised occupant area plus the proportionate share of Floor Service Area and a proportionate share of Building Service Area apportioned in accordance with the standards of the Building established by Landlord.

968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE "B"
-2-

INITIAL
Landlord    |    Tenant

## SCHEDULE "C"

### Taxes Payable by Landlord and Tenant

Tenant's Taxes

1.  (a)   Tenant covenants to pay all Tenant's Taxes, as and when the same become due and payable. Where any Tenant's Taxes are payable by Landlord to the relevant taxing authorities, Tenant covenants to pay the amount thereof to Landlord.

    (b)   Tenant covenants to pay Landlord Tenant's Proportionate Share of the amount by which Landlord's Taxes in each Fiscal Period after the calendar year 2017 (the "Base Year") exceeds Landlord's Taxes applicable to the Base Year

Landlord's Taxes

    (c)   Landlord covenants to pay all Landlord's Taxes subject to the payments on account of Landlord's Taxes required to be made by Tenant elsewhere in this Lease. Landlord may appeal any official assessment or the amount of any Taxes or other taxes based on such assessment and relating to the Property. In connection with any such appeal, Landlord may defer payment of any Taxes or other taxes, as the case may be, payable by it to the extent permitted by law, and Tenant shall co-operate with Landlord and provide Landlord with all relevant information reasonably required by Landlord in connection with any such appeal.

Separate Allocation

    (d)   If Landlord is unable to obtain from the taxing authorities any separate allocation of Landlord's Taxes, Tenant's Taxes or assessment as required by Landlord to make calculations of Additional Rent under this Lease, such allocation shall be made by Landlord acting reasonably and shall be conclusive.

Information

    (e)   Whenever requested by Landlord, Tenant shall deliver to it receipts for payment of all Tenant's Taxes and furnish such other information in connection therewith as Landlord may reasonably require.

Tax Adjustment

    (f)   If the Building and the Other Buildings (as defined in Schedule "D") have not been taxed as completed and fully occupied buildings for any Fiscal Period, Landlord's Taxes will be determined by Landlord as if the Building and the Other Buildings had been taxed as completed buildings fully occupied by commercial tenants for any such Fiscal Period.

Definitions

2.  In this Lease:

    (a)   "Landlord's Taxes" shall mean the aggregate of all Taxes attributable to the Property, the Rent or Landlord in respect thereof and including, without limitation (i) any amounts imposed, assessed, levied or charged in substitution for or in lieu of any such Taxes, and (ii) the costs and expenses (including, without limitation, legal and other professional fees but not including interest and penalties on deferred payments) incurred in good faith by Landlord in contesting, resisting or appealing any Taxes; provided, however, there shall be excluded from Landlord's Taxes capital gains taxes, corporate income taxes, profit taxes and excess profit taxes to the extent such taxes are not levied in lieu of any of the foregoing against the Property or Landlord in respect thereof;

    (b)   "Taxes" shall mean all taxes, rates, duties, levies, fees, charges, local improvement rates, capital taxes, rental taxes and assessments whatsoever including fees, rents, and levies for air rights and encroachments on or over municipal property imposed, assessed, levied or charged by any school, municipal, regional, state, provincial, federal, parliamentary or other body, corporation, authority, agency or commission provided that "Taxes" shall not include any special utility, levies, fees or charges imposed, assessed, levied or charged which are directly associated with initial construction of the Property;

    (c)   "Tenant's Taxes" shall mean the aggregate of all Taxes (whether imposed upon Landlord or Tenant) attributable to the personal property, trade fixtures, business, income, occupancy or sales of Tenant or any other occupant of the Leased Premises, and to any Leasehold Improvements or fixtures installed within the Leased Premises, and to the use by Tenant of any of the Property.

    (d)   Tenant's Proportionate Share (for purposes of both this Schedule "C" and Schedule "D") shall be as defined in Schedule "D".

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE "C"
-1-

P:01070025-4:12252.011

INITIAL

Landlord    |    Tenant

## SCHEDULE "D"

### Services and Costs

1. Landlord covenants with Tenant:

Interior Climate
Control

(a)    To maintain in the Leased Premises conditions of reasonable temperature and comfort in accordance with good standards applicable to normal occupancy of premises for office purposes in a first class manner subject to governmental regulations during hours to be determined by Landlord (but to be at least the hours [the "Tenant's Business Hours"] from 8:00 a.m. to 6:00 p.m. from Monday to Friday and from 9:00 a.m. to 1:00 p.m. on Saturday inclusive, with the exception of holidays), such conditions to be maintained by means of a system for heating and cooling, filtering and circulating air; Landlord shall have no responsibility for any inadequacy of performance of the said system if the occupancy of the Leased Premises or the electrical power or other energy consumed on the Leased Premises for all purposes exceeds reasonable amounts as reasonably determined by Landlord or Tenant installs partitions or other installations in locations which interfere with the proper operation of the system of interior climate control or if the window covering on exterior windows is not kept fully closed. After hours air conditioning shall be provided to the Leased Premises following Tenant's advance request therefor pursuant to reasonable notice procedures established by Landlord from time to time, subject to Tenant's payment to Landlord of Landlord's hourly charge therefor, which is currently $25.00 per hour;

Janitor Service

(b)    To (i) provide janitor and cleaning services to the Leased Premises and to common areas of the Building consisting of reasonable services in accordance with the standards of similar office buildings, and (ii) replace tubes and ballasts for Building standard lighting fixtures within the Leased Premises;

Elevators,
Lobbies, etc.

(c)    To keep available the following facilities for use by Tenant and its employees and invitees in common with other persons entitled thereto:

(i)    passenger and freight elevator service to each floor upon which the Leased Premises are located provided such service is installed in the Building and provided that Landlord may prescribe the hours during which and the procedures under which freight elevator service shall be available and may limit the number of elevators providing service outside normal business hours;

(ii)    common entrances, lobbies, stairways and corridors giving access to the Building and the Leased Premises, including such other areas from time to time which may be provided by Landlord for common use and enjoyment within the Property; and

(iii)   the washrooms as Landlord may assign from time to time which are standard to the Building, provided that Landlord and Tenant acknowledge that if an entire floor is leased to Tenant or some other tenant, then Tenant or such other tenant, as the case may be, may exclude others from the washrooms thereon.

Electricity/Water

2. Landlord covenants with Tenant and Tenant agrees and understands that Landlord shall have the sole right to furnish electricity to the Leased Premises for normal office use for lighting and for office equipment capable of operating from the circuits available to the Leased Premises and standard to the Building. Landlord shall furnish electricity twenty-four (24) hours per day, seven (7) days per week (subject to compliance with Applicable Laws, interruptions in electrical service by the utility providers, Landlord's normal and customary repair, maintenance and operations obligations with respect to the Building, and events of force majeure). Landlord shall also provide city water to the Leased Premises from the regular Building outlets for drinking, lavatory and toilet purposes, twenty-four (24) hours per day, seven (7) days per week (subject to compliance with Applicable Laws, interruptions in water service by the utility provider, Landlord's normal and customary repair, maintenance and operations obligations with respect to the Building, and events of force majeure). The amount of such electricity and water so provided to the Leased Premises shall be determined by Landlord pursuant to separate meters or submeters installed in the Leased Premises at Tenant's expense, and the costs of such electricity and water consumption shall be paid for by Tenant to Landlord separately (and not as part of Operating Costs) on a monthly basis during the Term of this Lease, as may be extended (such payment to be made within ten (10) days after invoice therefor from Landlord); provided, however, if at any time the electricity consumed in the Leased Premises is (i) provided directly by the utility company, (ii) measured separately by such utility company through such company's separate electrical meters and (iii) billed separately by such utility company to Tenant, then Tenant shall, prior to delinquency, pay the costs of

INITIAL

Landlord    |    Tenant

such electrical consumption costs directly to such utility company (and not to Landlord) based upon such separate bills.

Landlord's Acts

3. Landlord shall maintain and keep in repair the facilities required for the provision of the interior climate control, elevators and other services referred to in Paragraphs 1(a), 1(c) and 2 above in accordance with the standards of office buildings similar to the Building in the Sorrento Mesa area of San Diego, California but reserves the right to stop the use of any of these facilities and the supply of the corresponding services when necessary by reason of accident or breakdown or during the making of repairs, alterations or improvements, in the reasonable judgment of Landlord necessary or desirable to be made, until the repairs, alterations or improvements shall have been completed to the reasonable satisfaction of Landlord.

Additional
Services

4. (a) Landlord may (but shall not be obliged) on request of Tenant supply services or materials to the Leased Premises and the Property which are not provided for under this Lease and which are used by Tenant (the "Additional Services") including, without limitation,

    (i) replacement of non-Building standard tubes and ballasts;

    (ii) carpet shampooing;

    (iii) window covering cleaning;

    (iv) locksmithing;

    (v) removal of bulk garbage;

    (vi) picture hanging; and

    (vii) special security arrangement.

(b) When Additional Services are supplied or furnished by Landlord, accounts therefor shall be rendered by Landlord and shall be payable by Tenant to Landlord on demand plus a five percent (5%) administrative fee. If Landlord shall elect not to supply or furnish Additional Services, only persons with prior written approval by Landlord (which approval shall not be unreasonably withheld) shall be permitted by Landlord or Tenant to supply or furnish Additional Services to Tenant and the supplying and furnishing shall be subject to the reasonable rules fixed by Landlord with which Tenant undertakes to cause compliance and to comply.

Operating Costs
Payable by Tenant

5. (a) Tenant covenants to pay Landlord Tenant's Proportionate Share (as defined below) of the amount by which the Operating Costs in each Fiscal Period after the calendar year 2017 (the "Base Year") exceeds the Operating Costs applicable to the Base Year; provided, however, that notwithstanding anything to the contrary set forth in this Paragraph 5, when calculating Operating Costs for the Base Year, Operating Costs shall exclude one-time conservation costs and other special charges, costs or fees incurred in the Base Year only, including, but not limited to, those attributable to market-wide labor-rate increases or other extraordinary circumstances, including, but not limited to, boycotts and strikes;

(b) In addition to Tenant's obligation to pay the Additional Rent pursuant to the provisions of this Lease and subject to the other terms and conditions of this Lease, Tenant shall be responsible during the Term for all costs, charges and expenses incurred by Tenant as a result of Tenant's use and/or occupancy of the Leased Premises;

(c) In this Lease "Operating Costs" shall include all costs incurred or which will be incurred by Landlord in discharging its obligations under this Lease and in the maintenance, operation, administration and management of the Property, including without limitation:

    (i) cost of heating, ventilating and air-conditioning;

    (ii) cost of water and sewer charges and the cost of electricity, fuel and/or other forms of energy which are not separately metered and recovered or paid by tenants (it being acknowledged and agreed, however, that since Tenant is paying directly for all electricity and water consumed in the Leased Premises pursuant to Paragraph 2 above, the cost of all electricity and water consumed in the Leased Premises and the leased premises of other tenants in the Property shall be excluded from Operating Costs);

    (iii) cost of operation of the alarm systems for the Property (it being acknowledged and agreed, however, Landlord may provide separate monthly bills to Tenant for Tenant's Proportionate Share of the costs of

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE "D"
-2-

P:01070025-4:12252.011

INITIAL
Landlord    |    Tenant

DocuSign Envelope ID: F58359BB-85A0-4693-B41D-C352B45D676

telephone service necessary to operate such alarm systems, in which case such telephone costs shall be paid for by Tenant to Landlord separately [and not as part of Operating Costs] on a monthly basis during the Term of this Lease, as may be extended, such payment to be made within ten (10) days after invoice therefor from Landlord);

(iv)   costs of insurance carried by Landlord pursuant to Paragraph 9(a) of this Lease and cost of any deductible amount paid by Landlord in connection with each claim made by Landlord under such insurance;

(v)   cost of Property management office expenses, including telephone, rent, stationery and supplies;

(vi)   costs of all elevator and escalator (if installed in any part of the Property) maintenance and operation;

(vii)   costs of operating staff, management staff and other administrative personnel, including salaries, wages, fringe benefits, a management fee, and the cost (including rent) of Landlord's on-site property management office for the Property and all utilities, supplies and materials used in connection therewith;

(viii)   cost of providing security and costs of repair, maintenance and replacement of communications, fire and life safety systems serving the Property;

(ix)   cost of providing janitorial services, window cleaning, garbage and snow removal and pest control;

(x)   cost of supplies and materials;

(xi)   cost of decoration of common areas;

(xii)   cost of landscaping;

(xiii)   cost of maintenance and operation of the parking area and costs of operating, maintaining, repairing, and replacing all pedestrian and vehicular entrances and exits, passageways, driveways, tunnels, subway connections and delivery and holding areas used in connection with the Property;

(xiv)   cost of consulting, and professional fees including expenses;

(xv)   cost of replacements, additions and modifications unless otherwise included under Operating Costs under subparagraph (xvi) below, and cost of repair;

(xvi)   the amortized cost (as described hereinbelow) of any capital alterations, capital additions, capital replacements and/or capital improvements made to the Property or any portion thereof:  (A) which are intended to reduce Operating Costs in connection with the management, maintenance, repair, replacement or operation of the Property or any portion thereof; (B) that are required under any Applicable Laws; (C) pertaining to replacement of wall and floor coverings, ceiling tiles and fixtures in lobbies, corridors, restrooms and other common or public areas or facilities; or (D) which are reasonably determined by Landlord to be reasonably required to maintain the functional character of the Property as a first-class office building project; the cost of each such capital item shall be amortized over the period of Landlord's reasonable estimate of the economic life of such item, but not to exceed fifteen (15) years, using equal monthly installments of principal and interest at ten percent (10%) per annum compounded semi-annually (the "Amortization Rate"); and

(xvii)   the rental expense of, or the amortized cost of acquiring, personal property used in the maintenance, operation and repair of the Property, which amortization (if applicable) shall be at the Amortization Rate over the period of Landlord's reasonable estimate of the economic life of such personal property, but not to exceed fifteen (15) years.

(d)   In this Lease there shall be excluded from Operating Costs the following:

(i)   interest on debt and capital retirement of debt;

(ii)   such of the Operating Costs as are recoverable from insurance proceeds, or would have been recoverable had Landlord carried the insurance that Landlord is required to carry under this Lease or under Applicable Laws;

(iii)   costs as determined by Landlord of acquiring tenants for the Property;

(iv)   leasing commissions, attorneys' fees and other costs and expenses incurred in connection with negotiations or disputes with present or prospective tenants or other occupants of the Property;

(v)   costs (including permit, license and inspection costs) incurred in renovating or otherwise improving or decorating, painting or redecorating space for tenants or occupants of vacant space in the Property;

INITIAL

Landlord   |   Tenant

(vi)   the cost of providing any service directly to and paid directly by any tenant (outside of such tenant's payment of its proportionate share of Operating Costs) including, without limitation, the cost of electricity usage to tenant premises;

(vii)   depreciation and amortization except as expressly permitted in Paragraphs 7(c)(xvi) and (xvii) above, and except on materials, tools, supplies and vendor-type equipment purchased by Landlord to enable Landlord to supply services Landlord might otherwise contract for with a third party where such depreciation and amortization would otherwise have been included in the charge for such third party services, all as determined in accordance with standard real estate accounting practices consistently applied;

(viii)   except as expressly permitted in Paragraphs 7(c)(xvi) and (xvii) above, costs of a capital nature, including capital alterations, capital additions, capital replacements and capital improvements, all as determined in accordance with standard real estate accounting practices consistently applied;

(ix)   expenses in connection with services or other benefits which are not provided to Tenant but which are provided to another tenant or occupant of the Property free of charge;

(x)   costs incurred due to violation by Landlord or any tenant of the terms and conditions of any lease of space in the Property;

(xi)   overhead or profit increments paid to Landlord or its subsidiaries or affiliates of Landlord for services in or provided with respect to the management, operation, maintenance and repair of the Property to the extent the same exceeds the cost of such services render by unaffiliated third parties on a competitive basis;

(xii)   any compensation and employee benefits paid to clerks, attendants, or other persons in commercial concessions operated by Landlord, except for the operation of the parking facilities serving the Property;

(xiii)   costs associated with the operation of the business of the partnership or entity which constitutes the Landlord, as the same are distinguished from the costs of operation of the Building (which costs for the operation of the Building shall specifically include, but not be limited to, accounting costs associated with the operation of the Building);

(xiv)   costs associated with the operation of the business of the partnership or entity which constitutes the Landlord include costs of partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Building, and costs incurred in connection with any disputes between Landlord and its employees, between Landlord and Building management, or between Landlord and tenants or occupants;

(xv)   the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Building unless such wages and benefits are prorated to reflect time spent on operating and managing the Building vis-à-vis time spent on matters unrelated to operating and managing the Building; provided, that in no event shall Operating Expenses for purposes of this Lease include wages and/or benefits attributable to personnel above the level of property manager/property director or chief building engineer;

(xvi)   any gifts provided to any entity whatsoever, including, but not limited to, Tenant, other tenants, employees, vendors, contractors, prospective tenants and agents;

(xvii)   the cost of any magazine, newspaper, trade or other subscriptions;

(xviii)   all items and services for which Tenant or any other tenant in the Property reimburses Landlord (other than through the Operating Costs pass-through provisions of their leases) or which Landlord provides selectively to one or more tenants (other than Tenant) without reimbursement;

(xix)   advertising and promotional expenditures;

(xx)   costs incurred to repair or replace mechanical equipment or systems used in or at the Property to the extent such costs are reimbursed by any warranty, rebate, guarantee, or service contract on such equipment or systems;

(xxi)   the cost of correcting defects in the original design or construction of the Property;

(xxii)   any costs or expenses incurred to bring the Property into compliance with Applicable Laws in existence as of the date of execution of this Lease;

(xxiii)   any costs arising from the Landlord's political or charitable contributions;

INITIAL
Landlord   |   Tenant

DocuSign Envelope ID: F63359BB-86A0-4608-B41D-C252B45D676

(xxiv) any costs, other than those incurred in ordinary maintenance and repair, for sculpture, paintings, fountains or other objects of art;

(xxv) costs incurred to comply with Environmental Laws with respect to any hazardous substances which are prohibited, restricted, regulated or controlled under any Environmental Laws, to the extent such hazardous substances (A) were in existence in, on, under or about the Property prior to the date or execution of this Lease, and were of such a nature that a federal, state or municipal governmental or quasi-governmental authority, if it had then had knowledge of the presence of such hazardous substances, in the state, and under the conditions that it then existed in, on, under or about the Property, would have then required the removal, remediation or other action with respect thereto; and/or (B) are disposed of or otherwise introduced into, on, under or about the Property after the date of execution of this Lease by Landlord or Landlord's agents, employees, contractors or licensees or other third parties (including any other tenants of the Property) and are of such a nature, at time of disposition or introduction, that a federal, state or municipal governmental or quasi-governmental authority, if it had then had knowledge of the presence of such hazardous substances, in the state, and under the conditions, that they then existed in, on, under or about the Property, would have then required the removal, remediation or other action with respect thereto; and

(xxvi) rent for any office space occupied by Building management personnel to the extent the size or rental rate of such office space exceeds the size or fair market rental value of office space occupied by management personnel of the comparable buildings in the vicinity of the Building, with adjustment where appropriate for the size of the applicable project.

Gross-Up

6. In calculating Operating Costs for any Fiscal Period (including the Base Year), if less than one hundred percent (100%) of Building and the Other Buildings (as defined below) are occupied by tenants, then the amount of such Operating Costs shall be deemed for the purposes of this Schedule to be increased to an amount equal to the like Operating Costs which normally would be expected by Landlord to have been incurred had such occupancy been one hundred percent (100%) during such entire period.

Tenant's Proportionate
Share

7. "Tenant's Proportionate Share" (for purposes of both this Schedule "D" and Schedule "C") shall mean thirty-one decimal nine three two percent (31.932%) (which was calculated by dividing the Rentable Area of the Leased Premises by the total Rentable Area of the Building (i.e., 93,220 square feet of Rentable Area), and stating such amount as a percentage.

Multi-Building
Adjustments; Cost
Pools

8. The parties acknowledge and agree that the Building is part of a multi-building commercial project consisting of the Building, the Related Buildings and such other buildings as Landlord may elect to construct and include as part of the Property from time to time (the Related Buildings and any such other buildings are sometimes referred to herein, collectively, as the "Other Buildings"), and that certain of the Landlord's Taxes and Operating Expenses shall be shared among the Building and/or such Other Buildings, while certain other costs and expenses which are solely attributable to the Building and such Other Buildings, as applicable, shall be allocated directly to the Building and the Other Buildings, respectively. Accordingly, notwithstanding anything to the contrary set forth above in this Schedule "D" or in Schedule "C", Operating Costs and Landlord's Taxes shall be determined for each Fiscal Period for the Property as a whole, and a portion of such Operating Costs and Landlord's Taxes, which portion shall be determined by Landlord on an equitable basis, shall be allocated to the Building (as opposed to the tenants of the Other Buildings), and such portion so allocated to the Building shall be the amount of the Operating Costs and Landlord's Taxes upon which Tenant's Proportionate Share shall be calculated. Such portion of the Operating Costs and Landlord's Taxes allocated to the Building shall include (a) all Operating Costs and Landlord's Taxes which are attributable solely to the Building, plus (b) an equitable portion of the Operating Costs and Landlord's Taxes attributable to the Property as a whole. As an example of such allocation with respect to Landlord's Taxes, it is anticipated that Landlord may receive separate tax bills which separately assess the improvements component of Landlord's Taxes for each building in the Property, and such separately assessed Landlord's Taxes shall be calculated for and allocated separately to each such applicable building.

In connection with the foregoing, Landlord shall have the right, from time to time, to equitably allocate some or all of the Operating Costs and Landlord's Taxes between the Building and the Other Buildings and/or among different tenants of the Property and/or among different buildings of the Property as and when such different buildings are constructed and added to (and/or excluded from) the Property or otherwise (the "Cost Pools"). Such Cost Pools may include, without limitation, the office space tenants and the retail space tenants of the Property or of a building or buildings within the Property. In addition, Landlord shall have the right from time to time, in its reasonable discretion, to include or exclude existing or future buildings in the Property for purposes of

INITIAL

Landlord    |    Tenant

determining Operating Costs and Landlord's Taxes and/or the provision of various services and amenities thereto, including allocation of Operating Costs and Landlord's Taxes in any such Cost Pools and then equitably allocating the same to the Building and the Other Buildings, as applicable, on a non-discriminatory basis.

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE "D"
-6-

P:01070025-4:12252.011

INITIAL
Landlord  |  Tenant

## SCHEDULE "E"

### Rules and Regulations

1.   The sidewalks, entry passages, elevators (if installed in the Building) and common stairways shall not be obstructed by Tenant or used for any other purpose than for ingress and egress to and from the Leased Premises.  Tenant will not place or allow to be placed in the Building corridors or public stairways any waste paper, dust, garbage, refuse or anything else whatsoever.

2.   The washroom plumbing fixtures and other water apparatus shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, ashes or other substances shall be thrown therein.  The expense of any damage resulting by misuse by Tenant shall be borne by Tenant.

3.   Tenant shall permit window cleaners to clean the windows of the Leased Premises during normal business hours.

4.   No birds or animals (except certified service animals) shall be kept in or about the Property nor shall Tenant operate or permit to be operated any musical or sound-producing instruments or device or make or permit any improper noise inside or outside the Leased Premises which may be heard outside such Leased Premises.

5.   No one shall use the Leased Premises for residential purposes, or for the storage of personal effects or articles other than those required for business purposes.

6.   Landlord will have the right to prevent any person from entering or leaving the Building or the Property unless provided with a key to the Leased Premises or an access card to the Building and the Leased Premises, issued by Landlord.  Any persons found in the Building at such times without such keys and passes will be subject to the surveillance of the employees and agents of Landlord.

7.   No dangerous or explosive materials shall be kept or permitted to be kept in the Leased Premises.

8.   Tenant shall not permit any cooking in the Leased Premises except for food warmed up in microwaves for consumption by employees or guests of Tenant.  Tenant shall not install or permit the installation or use of any machine dispensing goods for sale in the Leased Premises without the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed.  Only persons authorized by Landlord shall be permitted to deliver or to use the elevators (if installed in the Building) for the purpose of delivering food or beverages to the Leased Premises.

9.   Tenant shall not bring in or take out, position, construct, install or move any safe, business machine or other heavy office equipment without first obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld.  In giving such consent, Landlord shall have the right in its sole discretion, to prescribe the weight permitted and the position thereof, and the use and design of planks, skids or platforms to distribute the weight thereof.  All damage done to the Building by moving or using any such heavy equipment or other office equipment or furniture shall be repaired at the expense of Tenant.  The moving of all heavy equipment or other office equipment or furniture shall occur only at times consented to by Landlord and the persons employed to move the same in and out of the Building must be acceptable to Landlord.  Safes and other heavy office equipment will be moved through the halls and corridors only upon steel bearing plates.  No freight or bulky matter of any description will be received into the Building or carried in the elevators (if installed in the Building) except during hours approved by Landlord.

10. Tenant shall give Landlord prompt notice of any accident to or any defect in the plumbing, heating, air-conditioning, ventilating, mechanical or electrical apparatus or any other part of the Building.

11. The parking of automobiles shall be subject to the charges and the reasonable regulations of Landlord.  Landlord shall not be responsible for damage to or theft of any car, its accessories or contents whether the same be the result of negligence or otherwise.  All vehicles (including, without limitation, bicycles) shall be parked in such areas of the Property's parking facilities as shall be designated by Landlord from time to time.  No vehicles (including, without limitation, bicycles) shall be stored in the Leased Premises

12. Tenant shall not mark, drill into or in any way deface the walls, ceilings, partitions, floors or other parts of the Leased Premises and the Building (except for normal pictures, tackboards, white board, signage at the reception desk and similar office uses).  Tenant shall not cut or bore holes for wires.  Tenant shall not affix any floor covering to the floor of the Leased Premises in any manner except as approved by Landlord.  Tenant shall repair any damage resulting from noncompliance with this rule.

13. Except with the prior written consent of Landlord, no tenant shall use or engage any person or persons other than the janitor or janitorial contractor of Landlord for the purpose of any cleaning of the Leased Premises.

14. If Tenant desires any electrical or communications wiring, Landlord reserves the right to reasonably direct qualified persons as to where and how the wires are to be introduced, and without such directions no borings or cutting for wires shall take place.  No other wires or pipes of any kind shall be introduced without the prior written consent of Landlord.

INITIAL

Landlord | Tenant

DocuSign Envelope ID: F68359BB-86A9-4609-B41D-C352B45D0676

15. Tenant shall not place or cause to be placed any additional locks upon any doors of the Leased Premises without the approval of Landlord and subject to any conditions imposed by Landlord.  Landlord will furnish two (2) keys free of charge to each door in the Leased Premises that has a passageway lock.  Additional keys may be obtained from Landlord at the cost of Tenant.  Tenant shall not make or have made additional keys on its own.  Tenant shall have the right to install as a Leasehold Improvement, at Tenant's sole cost and expense, a card-reader access system for the Premises; provided, however, that (i) the plans and specifications for any such system shall be subject to Landlord's reasonable approval, (ii) any such system must be compatible with any existing systems of the Building, (iii) Tenant's obligation to indemnify, defend and hold Landlord harmless as provided in, and subject to, Section 9(d) of the Lease shall also apply to Tenant's use and operation of any such system, (iv) the installation of such system shall otherwise be subject to the terms and conditions of this Lease with respect to Leasehold Improvements, and (v) notwithstanding anything to the contrary in this Lease, Tenant shall remove such system upon the expiration or earlier termination of this Lease.  Tenant shall at all times provide Landlord with an access card for such system, which access shall be subject at all times (except in case of emergency) to Tenant's reasonable security, safety and confidentiality policies.

16. Tenant shall be entitled to have its name shown at one of the entrance doors to the Leased Premises at Tenant's expense, but Landlord shall in its sole discretion design the style of such identification.

17. Tenant shall keep the window coverings (if any) in a closed position during period of direct sun load.  Tenant shall not interfere with or obstruct any perimeter heating, air-conditioning or ventilating units.

18. Tenant shall not conduct, and shall not permit any, canvassing in the Building or at the Property.

19. Tenant shall take care of the rugs and drapes (if any) in the Leased Premises and shall arrange for the carrying-out of regular spot cleaning and shampooing of carpets and dry cleaning of drapes in a manner acceptable to Landlord.

20. Tenant shall permit the periodic closing of lanes, driveways and passages for the purpose of preserving Landlord's rights over such lanes, driveways and passages.

21. Tenant shall not place or permit to be placed any sign, advertisement, notice or other display on any part of the exterior of the Leased Premises or elsewhere if such sign, advertisement, notice or other display is visible from outside the Leased Premises without the prior written consent of Landlord which may not be unreasonably withheld.  Tenant, upon request of Landlord, shall immediately remove any sign, advertisement, notice or other display which Tenant has placed or permitted to be placed which, in the reasonable opinion of Landlord, is objectionable, and if Tenant shall fail to do so, Landlord may remove the same at the expense of Tenant.  Notwithstanding anything to the contrary, Tenant shall have the right to install a sign with its name and corporate logo which may be visible through the entrance to the Premises, subject to Landlord's prior approval of such sign pursuant to this Section 21.

22. Landlord shall have the right to make such other and further reasonable rules and regulations and to alter the same as in its judgment may from time to time be needful for the safety, care, cleanliness and appearance of the Leased Premises and the Building and for the preservation of good order therein, and the same shall be kept and observed by the tenants, their employees and servants.  Landlord also has the right to suspend or cancel any or all of these rules and regulations herein set out.

968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE "E"
-2-

INITIAL

Landlord    |    Tenant

# SCHEDULE "F"

## Leasehold Improvements

Definition of
Leasehold
Improvements

1.     For purposes of this Lease, the term "Leasehold Improvements" includes, without limitation, all fixtures, improvements, installations, alterations and additions from time to time made, erected or installed by or on behalf of Tenant, or any previous occupant of the Leased Premises, in the Leased Premises, including all partitions, doors and hardware however affixed, and whether or not movable, all mechanical, electrical and utility installations (other than the Base Building) and all carpeting and drapes with the exception only of furniture and equipment not of the nature of fixtures. The term "Leasehold Improvements" includes the initial Tenant Improvements which Landlord shall cause to be constructed and installed in the Leased Premises pursuant to Section 5 below; provided, however, the provisions of Sections 2 and 3 below in this Schedule "F" shall not apply to such initial Tenant Improvements.

Installation of
Improvements
and Fixtures

2.     Tenant shall not make, erect, install or alter any Leasehold Improvements in the Leased Premises without having requested and obtained Landlord's prior written approval. Landlord's approval shall not, if given, under any circumstances be construed as a consent to Landlord having its estate charged with the cost of work. Landlord shall not unreasonably withhold or delay its approval to any such request, but failure to comply with Landlord's reasonable requirements from time to time for the Building shall be considered sufficient reason for refusal. In making, erecting, installing or altering any Leasehold Improvements Tenant shall not, without the prior written approval of Landlord, alter or interfere with any installations which have been made by Landlord or others and in no event shall alter or interfere with window coverings (if any) or other light control devices (if any) installed in the Building. Tenant's request for any approval hereunder shall be in writing and accompanied by an adequate description of the contemplated work and, where considered reasonably appropriate by Landlord, working drawings and specifications thereof. If Tenant requires from Landlord drawings or specifications of the Building in connection with the Leasehold Improvements, Tenant shall pay the cost thereof to Landlord within thirty (30) days of demand. Any reasonable costs and expenses incurred by Landlord in connection with any Leasehold Improvements installed by or for Tenant in the Leased Premises shall be paid by Tenant to Landlord within thirty (30) days of demand. All work to be performed in the Leased Premises shall be performed by competent and adequately insured contractors and subcontractors of whom Landlord shall have approved in writing prior to commencement of any work, such approval not to be unreasonably withheld (except that Landlord may require that Landlord's contractors and subcontractors be engaged for any mechanical or electrical work) and by workmen who have labor union affiliations that are compatible with those affiliations (if any) of workmen employed by Landlord and its contractors and subcontractors. All such work including the delivery, storage and removal of materials shall be subject to the reasonable supervision of Landlord, shall be performed in accordance with any reasonable conditions or regulations imposed by Landlord including, without limitation, payment on demand of a reasonable fee of Landlord for such supervision, and shall be completed in good and workmanlike manner in accordance with the description of the work approved by Landlord and in accordance with all Applicable Laws. Copies of required building permits or authorizations shall be obtained by Tenant at its expense and copies thereof shall be provided to Landlord. If Tenant undertakes Leasehold Improvements, upon completion of such Leasehold Improvements Tenant shall supply to Landlord complete "As-Built" drawings representing Leasehold Improvements installed and, if applicable, an engineer approved air balance report. If any locks shall be installed on the entrance doors or in any doors in the Leased Premises that are not keyed to the Building master key system, then Tenant shall provide a copy of the key for such lock to Landlord. Notwithstanding the foregoing, Tenant shall have the right to construct any Leasehold Improvements that do not (i) affect the structural portions of the Building or any of the Building systems, (ii) require a building permit, (iii) affect the exterior appearance of the Building, (iv) trigger any legal requirement which would require Landlord to make any alteration or improvement to the Building systems (e.g., mechanical or electrical systems) or the common areas of the Building, (v) result in the voiding of Landlord's insurance, the increasing of Landlord's insurance risk or the disallowance of sprinkler credits, or (vi) cost in excess of $10,000.00 for any individual work of improvement or $50,000.00 in the aggregate during the Term (collectively, "Cosmetic Leasehold Improvements") without Landlord's prior consent. Tenant shall give Landlord at least fifteen (15) days prior notice of such Cosmetic Leasehold Improvements, which notice shall be accompanied by reasonably adequate evidence that such changes meet the criteria contained in this Section. Except as otherwise provided, the term "Leasehold Improvements" shall include Cosmetic Leasehold Improvements.

Liens and
Encumbrances on
Improvements
and Fixtures

3.     In connection with the making, erection, installation or alteration of Leasehold Improvements (which are other than the initial Tenant Improvements described in Section 5 below) and all other work or installations made by or for Tenant in the Leased Premises Tenant shall comply with all the provisions of the construction lien and other similar statutes from time to time applicable thereto (including any proviso requiring or enabling the retention by way of holdback of portions

INITIAL

Landlord        |        Tenant

of any sums payable) and, except as to any such holdback, shall promptly pay all accounts relating thereto.  Tenant will not create any mortgage, conditional sale agreement or other encumbrance in respect of its Leasehold Improvements or, without the written consent of Landlord, with respect to its trade fixtures nor shall Tenant take any action as a consequence of which any such mortgage, conditional sale agreement or other encumbrance would attach to the Property or any part thereof.  If and whenever any construction or other lien for work, labor, services or materials supplied to or for Tenant or for the cost of which Tenant may be in any way liable or claims therefore shall arise or be filed or any such mortgage, conditional sale agreement or other encumbrance shall attach, Tenant shall within twenty (20) days after submission by Landlord of notice thereof procure the discharge thereof, including any certificate of action registered in respect of any lien, by payment or giving security or in such other manner as may be required or permitted by law, and failing which Landlord may avail itself of any of its remedies hereunder for default of Tenant and may make any payments or take any steps or proceedings required to procure the discharge of any such liens or encumbrances, and shall be entitled to be repaid by Tenant on demand for any such payments and to be paid on demand by Tenant for all costs and expenses in connection with steps or proceedings taken by Landlord and Landlord's right to reimbursement and to payment shall not be affected or impaired if Tenant shall then or subsequently establish or claim that any lien or encumbrances so discharged was without merit or excessive or subject to any abatement, set-off or defense.  Tenant agrees to indemnify Landlord from all claims, costs and expenses which may be incurred by Landlord in any proceedings brought by any person against Landlord alone or with another or others for or in respect of work, labor, services or materials supplied to or for Tenant.

Removal of
Improvements
and Fixtures

4.      The initial Tenant Improvements and all other Leasehold Improvements in or upon the Leased Premises shall immediately upon their placement be and become Landlord's property without compensation therefor to Tenant.  Except to the extent otherwise expressly agreed by Landlord in writing, neither the initial Tenant Improvements nor any other Leasehold Improvements shall be removed by Tenant from the Leased Premises either during or at the expiration or sooner termination of the Term except that:

(a)      Tenant shall, prior to the end of the Term, remove such of the Leasehold Improvements that are designated by Landlord in writing to be removed at the time consent to such Leasehold Improvements is granted by Landlord; however, cabling and wiring used by or installed for Tenant shall be removed by Tenant prior to the end of the Term and Landlord shall have no obligation to notify Tenant of such removal obligation; and

(b)      Tenant shall, prior to the end of the Term, remove all of its furniture, equipment, trade fixtures and personal property from the Leased Premises, and during the Term, Tenant may also remove any such items of furniture, equipment, trade fixtures and personal property in the usual and normal course of its business.

Tenant shall, in the case of every removal, make good at the expense of Tenant any damage caused to the Property by the installation and removal.  In the event of the non-removal by the end of the Term, or sooner termination of this Lease, of (i) any Leasehold Improvements required to be removed by Tenant pursuant to this Lease, or (ii) any of Tenant's furniture, trade fixtures, equipment or personal property, Landlord shall have the option, in addition to its other remedies under this Lease, to (A) remove any such items and repair any such damage resulting from such removal, and (B) declare to Tenant that Tenant's furniture, trade fixtures, equipment and all personal property are the property of Landlord and Landlord upon such a declaration may store and/or dispose of such items and retain any proceeds of disposition as security for the obligations of Tenant to Landlord, and Tenant shall be liable to Landlord for any storage costs and other expenses incurred by Landlord in connection with the exercise of any of Landlord's rights pursuant to this Section 4.

Initial Tenant Improvements

5.  This Section 5 shall set forth the terms and conditions relating to the design and construction of the initial Tenant Improvements (as defined below) for the Leased Premises to be constructed by Landlord.

(a)      Base Building.   Upon the Commencement Date, Tenant shall accept the Base Building components of the Building (including those within the Leased Premises and on the first (1st), third (3rd) and fourth (4th) floors of the Building), the remainder of the Building and the Leased Premises in their "as-is" condition, and, except as otherwise expressly provided in this Lease, Landlord shall not be obligated to make or pay for any alterations or improvements to the Leased Premises or the Building except as otherwise provided in this Lease.

(b)      Construction Drawings.  Prior to the execution of this Lease, Landlord and Tenant shall approve a detailed space plan for the construction of the Tenant Improvements in the Leased Premises prepared by Ware Malcomb (the "Final Space Plan") and Landlord shall pay the cost of the Final Space Plan up to $2,955.00, and only the cost for the Final Space Plan in excess of $2,955.00 shall be deducted from the Allowance.  Based upon and in conformity with the Final Space Plan, Landlord shall cause an architect and engineers designated by Landlord to complete the architectural and engineering drawings for the Tenant Improvements in the Leased Premises (collectively, the "Final Working Drawings"), and shall submit the same to Tenant for Tenant's approval.  The Final Working Drawings shall incorporate

INITIAL
Landlord      |      Tenant

modifications to the Final Space Plan as necessary to comply with the floor load and other structural and system requirements of the Building. The finishes and specifications of the Tenant Improvements shall be of a quality equal to or better than the specifications for the Building standard components previously delivered by Landlord to Tenant (collectively, the "Building Standards"). Tenant shall approve or reasonably disapprove the Final Working Drawings or any revisions thereto within five (5) business days after Landlord delivers the Final Working Drawings or any revisions thereto to Tenant; provided, however, that Tenant may only disapprove the Final Working Drawings to the extent the same are not (subject to changes reasonably required by Landlord) in substantial conformance with the Final Place Plan ("Working Drawing Design Problem"). Tenant's failure to reasonably disapprove the Final Working Drawings or any revisions thereto by written notice to Landlord (which notice shall specify in detail the reasonable reasons for Tenant's disapproval pertaining to any Working Drawing Design Problem) within said 3-business day period shall be deemed to constitute Tenant's approval of the Final Working Drawings or such revisions. The foregoing process shall be repeated until the Final Working Drawings are mutually approved by Landlord and Tenant (such mutually approved Final Working Drawings shall be referred to herein as the "Approved Working Drawings") in a writing signed by Landlord and Tenant (which may include signing the actual Final Working Drawings). Once the Approved Working Drawings have been approved by Landlord and Tenant, Tenant shall make no changes, change orders or modifications thereto without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion if such change or modification would: (i) increase the costs of the design, permitting or construction of the Tenant Improvements above Allowance, unless Tenant agrees in writing to pay for such increased costs; (ii) be of a quality lower than the quality of the Building Standards; and/or (iii) require any changes to the Base Building components of the Building. The Final Space Plan, Working Drawings and Approved Working Drawings shall be collectively referred to herein as, the "Construction Drawings".

(c)    Construction and Costs of Tenant Improvements. The contractor which shall construct the Tenant Improvements shall be a contractor selected pursuant to the following procedure. The Approved Working Drawings shall be submitted by Landlord to at least three (3) general contractors selected by Landlord and reasonably approved by Tenant. Each such contractor shall be invited to submit a sealed, fixed price contract bid (on such bid form as Landlord shall designate) to construct the Tenant Improvements. Each contractor is notified in the bid package of the time schedule for construction of the Tenant Improvements and each contractor's bid shall include such contractor's estimated time schedule for construction of the Tenant Improvements, including an estimation of the date upon which such contractor will achieve Substantial Completion of the Leased Premises. The subcontractors utilized by the Contractor shall be subject to Landlord's reasonable approval and the bidding instructions shall provide that as to work affecting the structure of the Building and/or the Building systems, Landlord shall be entitled to designate the subcontractors. The bids shall be submitted to Landlord and a reconciliation shall be performed by Landlord to adjust inconsistent or incorrect assumptions so that a like-kind comparison can be made and a low bidder determined. Landlord shall select the contractor who shall be the lowest bidder and who states that it will be able to meet Landlord's construction schedule. The reconciliation and Landlord's contractor selection shall be submitted to Tenant and Landlord's selection of the contractor shall be subject to Tenant's prior reasonable approval within twenty (20) days of receipt (and Landlord's selection shall be deemed approved if Tenant does not respond in such twenty (20) day period). The contractor selected may be referred to herein as the "Contractor." If the Contractor's bid results in an Over-Allowance Amount, Tenant shall have the right to value-engineer and revise the Approved Working Drawings and submit the revised Approved Working Drawings to the Contractor for the preparation of a revised bid to be delivered to Landlord and Tenant. Landlord shall cause the Contractor to (i) obtain all applicable building permits for construction of the Tenant Improvements (collectively, the "Permits"), and (ii) construct the Tenant Improvements as depicted on the Approved Working Drawings, in compliance with such Permits and all Applicable Laws in effect at the time of construction, and in good workmanlike manner. Landlord shall pay for the costs of the design (including Tenant's third party designer and project manager), permitting and construction of the Tenant Improvements in an amount up to, but not exceeding, $818,592.50 (i.e., $27.50 per square foot of Rentable Area of the Leased Premises) (the "Allowance"). The Allowance can be used for improvements to the Suite 165, Suite 300, Suite 350 and/or Suite 400 portions of the Leased Premises. The costs of the design, permitting and construction of the Tenant Improvements shall include Landlord's construction supervision and management fee in an amount equal to the product of (i) three percent (3%) and (ii) the amount equal to the sum of the hard and soft costs of the construction of the Tenant Improvements. Tenant shall pay for all costs of the design, permitting and construction of the Tenant Improvements in excess of the Allowance ("Over-Allowance Amount"), which payment shall be made to Landlord within thirty (30) days after Tenant's receipt of invoice therefor from Landlord and, in any event, prior to the date Landlord causes the Contractor to commence the actions described in the first sentence of this Section 5(c). If after Tenant pays the Over-Allowance Amount, Tenant requests any changes, change orders or modifications to the Approved Working Drawings (which Landlord approves pursuant to Section 5(b) above) which increase the costs of the design, permitting and construction of the Tenant Improvements, Tenant shall pay such increased costs to Landlord within thirty (30) days after Landlord's request therefor. Except as provided below, in no event shall Landlord be obligated to pay for, nor shall the Allowance be used to pay for, the costs of any of Tenant's furniture, computer systems, telephone

DocuSign Envelope ID: F68359BB-86A0-4608-B41D-3C352B45D076

systems, equipment or other personal property which may be depicted on the Construction Drawings; the costs of such items shall be paid for by Tenant from Tenant's own funds. Except as provided below, Tenant shall not be entitled to receive in cash or as a credit against any rental or otherwise, any portion of the Allowance not used to pay for the costs of the design, permitting and construction of the Tenant Improvements.

Landlord shall require Contractor to hold weekly project status meetings throughout the duration of the Tenant Improvement, and such meetings shall include the Contactor, Landlord's construction supervision, Architect, Tenant, and pertinent contractors.

Landlord to indicate which subcontractors are mandated to be utilized by the general contractor.

Notwithstanding the foregoing, Tenant shall have the right to elect, by written notice (the "FF&E Credit Notice") delivered to Landlord on or prior to the date that is sixty (60) days after the Substantial Completion of the Leased Premises, to receive an amount up to, but not exceeding $297,670.00 (i.e., $10.00 per square foot of Rentable Area of the Leased Premises), of any unused portion of the Allowance as a credit against the actual costs incurred by Tenant for Tenant's furniture, fixtures, Signage and equipment and/or Tenant's cabling (collectively, "Tenant's FF&E"). If Tenant timely and properly delivers the FF&E Credit Notice to Landlord and concurrently provides invoices evidencing Tenant's costs incurred for Tenant's FF&E, then such unused portion of the Allowance (not to exceed $297,670.00) shall be paid to Tenant within thirty (30) days of Landlord's receipt of the FF&E Credit Notice. If Tenant fails to timely deliver the FF&E Credit Notice and copies of paid invoices, Tenant shall be deemed to have waived its right to such unused portion of the Allowance.

(d)     Substantial Completion/Punch-List.  For purposes of this Lease and this Schedule "F", the Leased Premises shall be "Substantially Completed" and "Substantial Completion of the Leased Premises" shall occur upon the completion of construction of the Tenant Improvements in the Leased Premises pursuant to the Approved Working Drawings, with the exception of any punch-list items (which shall include only minor elements of the Tenant Improvements, the non-completion of which and Landlord's subsequent work to complete the same will not materially and adversely impair or interfere with Tenant's ability to use and occupy the Leased Premises for the purposes permitted under this Lease), and any tenant fixtures, work-stations, built-in furniture, or equipment to be installed by or for Tenant or under the supervision of the Contractor.  Within twenty (20) days after Landlord has notified Tenant that the Leased Premises has been Substantially Completed, Landlord and Tenant shall perform a mutual walk through inspection of the Leased Premises to identify and mutually approve any punch list items of the Tenant Improvements to be completed, and Landlord shall diligently thereafter complete and/or correct any such punch list items.

(e)     Change Order. If Tenant shall desire any changes to the Approved Working Drawings ("Change Order"), Tenant shall so advise Landlord in writing and Landlord shall determine whether such changes can be made in a reasonable and feasible manner. No later than five (5) business days following the request for a change order, the Contractor shall provide Tenant the estimate of the cost of the Change Order and the additional time it would take to undertake the work set forth in the Change Order for Tenant's review and approval.  Any and all costs of reviewing any requested changes, and any and all costs of making any changes to the Tenant Improvements which Tenant may request and which Landlord may agree to shall be paid as part of the Allowance and if there is no remaining portion of the Allowance, then at Tenant's sole cost and expense and shall be paid to Landlord upon demand and before execution of the change order. If Landlord approves Tenant's requested change, addition, or alteration, the Space Planner, at Tenant's sole cost and expense or by the unused Allowance, shall complete all working drawings necessary to show the change, addition or alteration being requested by Tenant.  Landlord and its Contractor shall not be permitted to make changes to the Approved Working Drawings (and the improvements performed pursuant to such drawings) without Tenant's consent, not to be unreasonably withheld, conditioned or delayed.



INITIAL
Landlord  |  Tenant

## SCHEDULE "H"

### Right of First Offer

(a)  <u>Right of First Offer</u>.  During the period (the "First Offer Period") from the date of mutual execution and delivery of this Lease until the Expiration Date of the Term of this Lease, but subject to the limitations set forth hereinbelow, Tenant shall have the one-time right of first offer to lease any space contiguous to the then-existing Leased Premises on the third (3rd) floor of the Building (the "First Offer Space"), when such applicable First Offer Space will or has become available for lease as determined by Landlord.  Notwithstanding anything herein to the contrary: (i) Tenant's right of first offer set forth herein shall be subject and subordinate to all rights of expansion, renewal, extension, first refusal, first offer or similar rights for all or any portion of the applicable First Offer Space granted to any tenants of the Building pursuant to leases which have been executed as of the date of mutual execution and delivery of this Lease (collectively, the "Superior Rights"); and (ii) Tenant shall have no such right of first offer during the last four (4) years of the initial Term of this Lease.

(b)  <u>Terms of Lease of First Offer Space</u>.  Landlord shall give Tenant written notice (each, a "First Offer Notice") that the applicable First Offer Space will or has become available for lease by Tenant as provided above (as such availability is determined by Landlord) pursuant to the terms of Tenant's right of first offer, as set forth in this Schedule "H", provided that no holder of Superior Rights desires to lease all or any portion of the First Offer Space.  Any such Landlord's First Offer Notice delivered by Landlord in accordance with the provisions hereinabove shall identify the applicable First Offer Space and set forth the terms upon which Landlord would lease such applicable First Offer Space to Tenant, including, without limitation (i) the anticipated date upon which such applicable First Offer Space will be available for lease by Tenant and the commencement date therefor, (ii) a schedule of construction of the Leasehold Improvements for such applicable First Offer Space, if any, (iii) the Basic Rent (including any rentable abatement) payable for such applicable First Offer Space, which shall be equal to the fair market rental rate for such applicable First Offer Space, as reasonably determined by Landlord based on the fair market value of comparable office buildings in the Sorrento Mesa area, (iv) the tenant improvement allowance, if any, for such applicable First Offer Space (which amount shall be reasonably determined by Landlord as part of the fair market rental rate for such applicable First Offer Space in the Sorrento Mesa area), and (v) the term of the lease for such applicable First Offer Space, which shall in all events be coterminous with the initial Term.

(c)  <u>Procedure for Acceptance</u>.  On or before the date which is five (5) business days after Tenant's receipt of Landlord's First Offer Notice (the "Election Date"), Tenant shall deliver written notice to Landlord ("Tenant's Election Notice") pursuant to which Tenant shall have the right to elect either to:  (i) lease the entire applicable First Offer Space described in the First Offer Notice upon the terms set forth in the First Offer Notice; or (ii) not lease such applicable First Offer Space.  If Tenant does not deliver Tenant's Election Notice electing one of the options in clauses (i) or (ii) hereinabove by the Election Date, then Tenant shall be deemed to have elected not to lease the applicable First Offer Space.  If Tenant elects or is deemed to have elected not to lease the applicable First Offer Space, then Tenant's right of first offer set forth in this Schedule "H" shall terminate with respect to such applicable First Offer Space so identified in the First Offer Notice and Landlord shall thereafter have the right to lease all or any portion of such applicable First Offer Space to anyone to whom Landlord desires on any terms Landlord desires.  Notwithstanding anything in this Schedule "H" to the contrary, (A) Tenant must elect to exercise its right of first offer herein with respect to the entire applicable First Offer Space described in the First Offer Notice and may not elect to lease only a portion thereof, and (B) Tenant's right of first offer to lease any First Offer Space not previously identified in any applicable First Offer Notice delivered by Landlord to Tenant shall not terminate as a result of Tenant's election or deemed election to refuse to lease any other applicable First Offer Space so identified in a First Offer Notice, and shall continue until the earlier of (1) the date such other applicable First Offer Space first becomes available for lease as determined by Landlord as provided hereinabove, or (2) the expiration of the First Offer Period.

(d)  <u>Amendment to Lease</u>.  If Tenant leases any applicable First Offer Space pursuant to this Schedule "H", then Landlord and Tenant shall promptly execute an amendment to this Lease covering such applicable First Offer Space and the lease terms thereof.

(e)  <u>Default; Personal</u>.  Notwithstanding anything in this Schedule "H" to the contrary, at Landlord's option, and in addition to all of Landlord's remedies under this Lease, at law or in equity, the right of first offer hereinabove granted to Tenant with respect to each applicable First Offer Space shall not be deemed to be properly exercised if, as of the date Tenant delivers Tenant's Election Notice to Landlord for such applicable First Offer Space, (i) Tenant is in default, and/or has previously been in default, under this Lease beyond the expiration of all applicable notice and cure periods, and/or (ii) Tenant's then-existing financial condition is materially worse than Tenant's financial condition as of the Commencement Date, as reasonably determined by Landlord.  In addition, Tenant's right of first offer to lease each such applicable First Offer Space is personal to the Original Tenant or any Affiliate Assignee, as the case may be, and may not be assigned or exercised, voluntarily or involuntarily, by or to, any person or entity other than the Original Tenant or such Affiliate Assignee, as the case may be, and shall only be available to and exercisable when the Original Tenant or such Affiliate Assignee, as the case may be, is in occupancy of the entire then existing Leased Premises.

*[Remainder of page intentionally left blank]*

968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE "H"
-1-

INITIAL
Landlord  |  Tenant

DocuSign Envelope ID: F68359BB-65A0-4699-B41D-1C352B45D676

## SCHEDULE "I"

### Parking License

THIS PARKING LICENSE (this "License") is made this 17th day of November, 2016.

BETWEEN:

**HUAWEI DEVICE USA INC.,**
(hereinafter called "Licensee")

---and---

**JOHN HANCOCK LIFE INSURANCE COMPANY (U.S. A.)**
(hereinafter called "John Hancock")

WHEREAS by that certain Lease Agreement (the "Lease") dated November 17, 2016, Licensee leased from John Hancock certain premises in the building located at 10180 Telesis Court, San Diego, California (the "Building"), which Building is part of a multi-building office project known as Seaview Corporate Center, and in connection therewith wishes to park automobiles in the surface parking areas and parking structure located within the Seaview Corporate Center project (collectively, the "Parking Facilities"):

NOW THEREFORE for good and valuable consideration (the receipt of which is hereby acknowledged), Licensee and John Hancock agree as follows:

1.      John Hancock grants to Licensee the right to park one hundred eleven (111) standard automobiles in such areas of the Parking Facilities as shall be designated by John Hancock from time to time, free of any parking charges.  Licensee agrees to park only in those spaces designated for standard automobiles.

2.      Licensee agrees to indemnify John Hancock against all liability, claims, damages and expenses due to or arising out of any act, omission or neglect by Licensee, or its agents, employees, invitees or licensees on or about the Parking Facilities or due to or arising out of any breach by Licensee of the provisions of this License or of the Parking Rules (hereinafter defined).

3.      Licensee agrees to comply with such reasonable rules (the "Parking Rules") as may be established from time to time by John Hancock covering the use of the Parking Facilities.

4.      John Hancock shall not be liable for any loss, injury or damage caused to persons using the Parking Facilities or to automobiles or their contents or any other property thereon, however caused, and Licensee agrees that such vehicles, contents and property shall be in the Parking Facilities at the sole risk of Licensee.

5.      Licensee shall not assign, sublicense or part with possession of any of the said parking rights to any person without the consent in writing of John Hancock which consent may not be unreasonably withheld provided that in lieu of such consent John Hancock may terminate this License and Licensee shall forthwith return the said parking rights to John Hancock.

6.      It is acknowledged that the parking cards or keys (if any) are the property of John Hancock and are to be returned upon expiration of this License.  Inoperative cards or keys will be replaced at no charge, but lost cards or keys will be replaced at a cost established by John Hancock from time to time.

INITIAL

Landlord    |    Tenant

# SCHEDULE "J"

## Termination Option

Tenant shall have a one-time option to terminate this Lease (the "Termination Option"), effective as of the last day of the seventieth (70th) month of the initial Term of this Lease (the "Termination Date").  To exercise the Termination Option, Tenant must deliver to Landlord on or before the date that is twelve (12) months prior to the Termination Date (the "Termination Notice Date"):  (i) written notice of Tenant's exercise of the Termination Option (the "Termination Notice"); and (ii) cash in the amount equal to the Termination Consideration (as defined below).  Landlord shall provide the amount of the Termination Consideration to Tenant, along with the backup calculation, upon written request by Tenant (and Tenant shall make such request no later than thirty (30) days prior to the Termination Notice Date).  If Landlord does not provide the calculation at least five (5) business days prior to the Termination Notice Date, then the Termination Notice Date shall be extended by one (1) business day for each day the Landlord is late in providing the calculation of the Termination Consideration.  As used herein, the "Termination Consideration" shall mean an amount equal to the sum of:  (A) the unamortized portion of the brokerage commissions paid or incurred by Landlord in connection with this Lease (including with respect to any First Offer Space leased by Tenant, if applicable, pursuant to Schedule "H"); plus (B) the unamortized portion of the Tenant Improvement Allowance provided by Landlord for the original Leased Premises pursuant to Schedule "F" (and any tenant improvement allowances and costs of tenant improvements provided and/or paid for by Landlord for any First Offer Space leased by Tenant, if applicable, pursuant to Schedule "H"); plus (C) the unamortized portion of the Basic Rent abated for the original Leased Premises pursuant to Paragraph 3 of this Lease (and any abated and/or free rent provided by Landlord for any First Offer Space leased by Tenant, if applicable, pursuant to Schedule "H").  The amortization schedule of the items set forth in clauses (A), (B) and (C) hereinabove shall be determined, together with interest at a rate of 8%, over (1) the initial Term of this Lease for the original Leased Premises with respect to such items pertaining to the original Leased Premises, and (2) over the applicable initial lease term for the applicable First Offer Space leased by Tenant pursuant to Schedule "H", with respect to such items pertaining to such applicable First Offer Space, and the unamortized portion thereof shall be determined based upon the unexpired portion of such applicable initial Term of this Lease for the original Leased Premises (or initial lease term for the applicable First Offer Space, as the case may be) as of the Termination Date had this Lease not been so terminated pursuant to this Schedule "J".  If Tenant properly and timely exercises the Termination Option pursuant to this Schedule "J", this Lease shall terminate at midnight on the Termination Date, and Tenant shall vacate and surrender exclusive possession of the Leased Premises to Landlord on or prior to the Termination Date in accordance with the applicable surrender provisions of this Lease.  Notwithstanding the foregoing provisions of this Schedule "J" to the contrary, (x) at Landlord's option, in addition to any other remedies available to Landlord under this Lease, at law and/or in equity, Tenant shall not be deemed to have properly exercised the Termination Option if, as of the date of Tenant's delivery to Landlord of the Termination Notice, Tenant is in default under this Lease beyond all applicable notice and cure periods, and (y) the Termination Option is personal to the original Tenant executing this Lease, and may only be exercised by such original Tenant (and not any assignee, sublessee or other transferee of Tenant's interest in this Lease or the Leased Premises).

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE "J"
-1-

P:01070025-4:12252.011

INITIAL
Landlord  |  Tenant

## SCHEDULE "K"

### Option to Renew

1.    Landlord covenants with Tenant that, subject to the provisions, restrictions and limitations set forth below in this Schedule "K", Landlord will, at the expiration of the initial Term of this Lease on written exercise notice delivered by Tenant to Landlord not more than fourteen (14) months prior to the expiration of the initial Term and not less than ten (10) months prior to the expiration of the initial Term, grant to Tenant one (1) five (5) year renewal (the "Option to Renew") of lease of the Leased Premises (the "Renewal Term") on the terms and conditions as set forth in this Lease save and except for (i) the right of further renewal, and (ii) except as set forth in Section 2 below, Leasehold Improvements (if any), Basic Rent, tenant improvement or refurbishment allowance (if any), and free rent or abatement period (if any). Notwithstanding the foregoing, at Landlord's option, in addition to any other remedies available to Landlord under this Lease, at law or in equity, the Option to Renew granted herein shall not be deemed properly exercised and the initial Term of this Lease shall not be extended by the Renewal Term if as of the date of delivery of such exercise notice by Tenant, Tenant is in default under this Lease beyond all applicable notice and cure periods.

2.    The Basic Rent for the Renewal Term shall be determined by negotiations between the parties hereto, and it is agreed that during such negotiations in respect of Basic Rent, they will be guided by fair market rental levels (either fixed or escalating during the Renewal Term) as would then be charged by landlords entering into new leases without consideration for any leasing concessions or other incentives (such as, but not limited to, tenant improvement allowances (if any) and free or abated rent (if any)), but having similar terms and conditions as contained herein and for similar premises in the Building and the Related Buildings or if not available in the Building and Related Buildings in similar buildings in the Sorrento Mesa area of San Diego, California (the "Comparable Buildings"); provided, however, in no event shall the Basic Rent per annum during the Renewal Term be less than the Basic Rent per annum for the last year of the initial Term.

3.    If the parties hereto are unable to agree in writing as to the Basic Rent for the Renewal Term prior to six (6) months before the expiration of the initial Term, then on notice being given by either party to the other, the Basic Rent shall be submitted to and be determined by arbitration in the following manner:

(i)    Landlord and Tenant shall each appoint one arbitrator (who shall by profession be a real estate broker who shall have been active over the ten (10) year period ending on the date of such appointment in the leasing of space in the Comparable Buildings), and both such arbitrators shall be appointed within fifteen (15) days of the date of the notice of arbitration hereunder being given by one party to the other;

(ii)    prior to the expiration of such 15-day period, each party shall submit to the other party a separate written determination of the fair market rental for the Leased Premises during the Renewal Term (failure of Tenant or Landlord to submit a written determination of such fair market rental within such 15- day period shall conclusively be deemed to be the non-determining party's approval of the fair market rental submitted within such 15-day period by the other party, in which event the following arbitration procedures shall no longer apply);

(iii)   the two arbitrators so appointed shall, within fifteen (15) days of the date of the appointment of the last appointed arbitrator agree upon and appoint a third arbitrator, who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two (2) arbitrators, but who shall not have represented either Landlord or Tenant within the 10-year period described above;

(iv)   the three arbitrators shall, within thirty (30) days of the appointment of the third arbitrator, reach the decision described in clause (v) hereinbelow and notify Landlord and Tenant thereof, and their decision shall be binding upon Landlord and Tenant;

(v)    the decision of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's submitted fair market rental for the Leased Premises during the Renewal Term is the closer to the actual fair market rental for the Leased Premises during the Renewal Term, as determined by the arbitrators, taking into account the requirements and considerations with respect thereto set forth in Section 2 above;

(vi)   the decision of the majority of the three arbitrators shall be binding upon Landlord and Tenant;

(vii)  if Landlord or Tenant fail to appoint an arbitrator within the time period provided in clause (i) hereinabove, the arbitrator appointed by one of them shall reach the decision described in clause (v) hereinabove, notify Landlord and Tenant thereof and his/her decision shall be binding upon Landlord and Tenant;

(viii) if the two arbitrators fail to agree upon and appoint a third arbitrator within the time period provided in clause (iv) hereinabove, then the third arbitrator shall be appointed by the Presiding Judge of the Superior Court of the county in which the Building is located, acting in his or her private and non-judicial capacity; and

(ix)   the cost of arbitration shall be paid by Tenant and Landlord equally, except that each party shall pay for the cost of its own witnesses and attorneys.

INITIAL  LY
Landlord  |  Tenant

4.      Tenant agrees to execute a mutually acceptable lease amendment then, at the commencement of the Renewal Term, being used by Landlord for the Building to give effect to this Option to Renew if exercised by Tenant.  Tenant shall execute such agreement prior to the commencement date of the Renewal Term.

5.      Notwithstanding the above, if Tenant does not exercise the Option to Renew in accordance with this Schedule "H", then the Option to Renew shall terminate and be of no further force or effect.

6.      Tenant's Option to Renew hereunder is personal to the original Tenant executing this Lease and automatically expires on any Transfer of this Lease or the parting with possession of all or any part of the Leased Premises whether or not the same is with the consent of Landlord.

968910.04/LA
373530-00002/1-21-14/nng/nng

P:01070025-4:12252.011

SCHEDULE K
-2-

INITIAL
Landlord    |    Tenant

## SCHEDULE "L"

### Location of Signage



INITIAL

Landlord | Tenant

## SCHEDULE "M"

### Approved Logo and Colors

968910.04/LA
373530-00002/1-21-14/nng/nng

SCHEDULE M
-1-

P:01070025-4:12252.011

INITIAL
Landlord    |    Tenant